**UNITED STATES COURT OF APPEALS**
**FIFTH CIRCUIT**

_____

No. 91-8044
_____

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

versus

MICHAEL ANTHONY HOLLOWAY,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Western District of Texas
_____

(May 27, 1992)

Before DAVIS, JONES, and EMILIO M. GARZA, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

This case is an appeal of a district court order suppressing cocaine found concealed in the undergarments of Michael Anthony Holloway. Cocaine was seized when, acting on information supplied by a reliable confidential informant, officers in an unmarked vehicle pulled out in front of Holloway and forced him to stop his vehicle. Holloway reversed, accelerated, and backed into an unmarked police unit moving up behind him, damaging both vehicles beyond repair. Officers then arrested Holloway and found crack cocaine in a plastic bag tucked inside his underwear. Prior to trial, Holloway moved to suppress this evidence on the grounds that it was the finding of an illegal search. Following a hearing, the district court granted Holloway's motion to

suppress. The government appeals. Finding that the search of Holloway's person which revealed crack cocaine was incident to a lawful arrest, we reverse the district court's order suppressing the evidence and remand this case for trial.

**I**

The government's case rests in large part on the information relayed to officers Staha and Thompson on August 21, 1989 from a confidential informant--information officer Staha testified to at trial:

A     The confidential informant told us about a subject that was selling "Crack" cocaine in the Rosewood Projects [in Austin, Texas] and . . . [the] informant told us his name, which was "Mike" Holloway; the car he was driving, which was a Chrysler New Yorker; and told us where we could find the vehicle, which was in the Rosewood Projects.
Q     Okay.  Did he tell you anything about . . . Holloway's possession of cocaine?
A     Yes, sir.  He told us that he was selling "Crack" cocaine in the projects and he was in possession of "Crack" cocaine, and he usually kept his "Crack" cocaine in his underwear.
Q     Had this confidential informant provided information to you in the past?
A     Yes, he has.
Q     Was it regarding individuals who possessed and sold "Crack" cocaine?
A     That's correct.
Q     And had that information then led to the arrest and subsequent prosecutions of those people?
A     Yes, sir.
Q     All right.  Did you know the person that was identified to you as--or had been named to you as Holloway?
A     I'd known him when I used to work the streets . . . in uniform.  I knew Michael from an establishment called Martin's Drive-in.
Q     All right.  What did you know about Holloway?
A     Personal knowledge, from informants and other sources of information, I knew he was a drug dealer out in east Austin area.
Q     Okay.  Besides the confidential informant that you first told the Court about, did other confidential

-2-

informants give you information about Holloway being a drug dealer?
A    Yes, sir.
Q    All right.  And did you have information that Holloway had recently--at least at the time that you were on the streets out there in August--recently gotten out of the penitentiary for selling narcotics?
A    Yes.
Q    Did the other officer and officers that were with you working that day, were they also aware of Mr. Holloway's prior drug dealing propensities?
A    Oh, yes, sir.
Q    All right.  And did y'all talk about this?
A    Holloway was--when we target an individual, Holloway was a person that we had targeted in the past. We never was able to make a case on him, but pretty much the whole Repeat Offenders Program office knew about Michael Holloway . . . .[1]

Acting within hours of receiving this information, officers Staha and Thompson who were in an unmarked police unit arranged for a marked unit to stop and investigate Holloway's Chrysler New Yorker.  Expecting that the investigation would turn up narcotics, they also arranged for additional support and, accordingly, they were soon joined by officers Clark and Duty-- two additional plainclothes officers in another unmarked unit.

At approximately 4:45 on a August 21, 1989, while waiting for the marked unit, officers Staha and Thompson observed Holloway and another individual get into a Chrysler New Yorker. The vehicle pulled away from the curb and started to leave. Deciding they had to act, Staha and Thompson drove their vehicle into the street and blocked Holloway's direction of travel.  The

---

[1]    Record on Appeal, vol. 3, at 4-6, *United States v. Michael Anthony Holloway*, No. 91-8044 (5th Cir. filed Apr. 11, 1991) ["Record on Appeal"].

officers then got out of the vehicle and--their guns drawn and Staha displaying his badge--yelled "Police, police, police."

Holloway came to a momentary stop ten to fifteen feet in front of the officers.  Unaware that the unit occupied by officers Duty and Clark was pulling up behind him, Holloway then reversed his vehicle, accelerated, and rammed into the unit occupied by Clark and Duty with enough force to damage both vehicles beyond repair.  The officers then helped Holloway out of his vehicle, frisked him, and found a bag containing seven rocks of crack cocaine concealed in his underwear.

A grand jury indicted Holloway for possessing more than 5 grams of cocaine base with intent to distribute--a violation of 21 U.S.C. § 841(a)(1).  Holloway moved to suppress the plastic bag containing crack cocaine as the product of an illegal search, and, after a hearing during which testimony was taken and exhibits were introduced, the district court granted that motion suppressing the evidence.  The government appeals.

**II**

The issues the government brings before us require us to make two determinations: (a) when Holloway was "seized" for Fourth Amendment purposes[2] and, (b) whether, at the time of that

---

[2]     A seizure may constitute an arrest or merely an investigatory detention, and there is no bright-line rule to distinguish one from the other.  We have held that such a determination depends upon the "reasonableness" of the intrusion in light of all the facts.  *See United States v. Martinez*, 808 F.2d 1050, 1053 (5th Cir.), *cert. denied*, 481 U.S. 1032 (1987), *describing United States v. Sharpe*, 470 U.S. 675, 105 S. Ct. 1568 (1985) (holding that--where officer drew his gun, ordered driver out of truck, patted him down for weapons, and detained him for

-4-

seizure, officers had the requisite reasonable suspicion to initiate an investigatory detention of Holloway or probable cause to arrest him.

Precisely when an arrest takes place is generally a question of fact,[3] and this court accepts a district court's purely factual findings unless clearly erroneous.[4]  However, in reviewing a district court's ruling on a motion to suppress based on live testimony at a suppression hearing, we do not readily accept a district court's factual findings if they are influenced by an incorrect view of law.  *See United States v. Gallo*, 927

---

fifteen minutes until DEA agent arrived, and suspect's vehicle was then searched by DEA agent--detention was an investigative stop that required only reasonable suspicion of criminal activity); *see also United States v. Watson*, No. 91-3313, slip op. at 2586 n. 1 (5th Cir. Jan. 31, 1992) (describing how, in determining when a "seizure" has occurred, police-citizen contact can be broken down into three tiers); *United States v. Zukas*, 843 F.2d 179, 181-82 (5th Cir. 1988) (describing three tiers of citizen-police contact for purposes of Fourth Amendment analysis), *cert. denied*, 490 U.S. 1019, 109 S. Ct. 1742 (1989). Therefore, our determinations will vary from case to case, depending on the facts presented. *See Sibron v. New York*, 392 U.S. 40, 59, 88 S. Ct. 1889, 1901 (1968) ("The constitutional validity of a warrantless search is pre-eminently the sort of question which can only be decided in the concrete factual context of the individual case.").

[3]    *See INS v. Delgado*, 466 U.S. 210, 216-17, 104 S. Ct. 1758, 1762-63 (1984) (holding that one must look to circumstances of encounter to determine whether detention under Fourth Amendment took place); *Florida v. Royer*, 460 U.S. 491, 500, 103 S. Ct. 1319, 1325 (1983) ("The scope of the intrusion permitted will vary to some extent with the particular facts and circumstances of each case."); *United States v. Worthington*, 544 F.2d 1275, 1279 (5th Cir.), cert. denied, 434 U.S. 817 (1977).

[4]    *See Anderson v. Bessemer City*, 470 U.S. 564, 573-74, 105 S. Ct. 1504, 1511-12 (1985); *United States v. Kohler*, 836 F.2d 885, 888 (5th Cir. 1988); *United States v. Fores*, 816 F.2d 1006, 1010 (5th Cir. 1987).

-5-

F.2d 815, 819 (5th Cir. 1991) ("In reviewing the district court's ruling on a motion to suppress based on live testimony at a suppression hearing, we must accept the district court's factual findings *unless they are clearly erroneous or influenced by an incorrect view of the law*.") (emphasis added); *United States v. Muniz-Melchor*, 894 F.2d 1430, 1433-34 (5th Cir. 1990) (holding that "the trial court's purely factual findings must be accepted unless clearly erroneous, or influenced by an incorrect view of the law, and the evidence must be viewed most favorable to the party prevailing below . . . ."), *cert. denied*, 110 S. Ct. 1957 (1990), *quoting United States v. Maldonado*, 735 F.2d 809, 814 (5th Cir. 1984).

The government has no quarrel with the district court's factual findings in this case and challenges the district court's determination that the officers did not have probable cause to conduct a warrantless search and arrest of Holloway--a mixed question of law and fact[5]--on the grounds that the district court's determination was influenced by an incorrect view of law. *Id.* ("Accepting [the district court's] facts, however, the ultimate determination as to probable cause for a warrantless search seems to be a question of law for this Court to decide."); United States v. Basey, 816 F.2d 980, 988 (5th Cir. 1987) ("The ultimate determination of reasonableness in investigatory stop cases is, however, a conclusion of law."). Accordingly, the

---

[5]  *Muniz-Melchor*, 894 F.2d at 1439 n.9 ("The determination whether law enforcement officers had probable cause to conduct a warrantless search involves a mixed question of law and fact.").

government's appeal is limited to pure questions of law and the legal element of a mixed question of law and fact--questions this court may freely review. *See Muniz-Melchor*, 894 F.2d at 1439 n. 9; *Basey*, 816 F.2d at 988.

### A

The district court found that:

> This was not an investigatory stop as the Government insists, *because, as Officer Howard Staha testified, the officers' intent at all times was to arrest the Defendant*. As Staha testified, the Austin officers had a strong desire to arrest Holloway for a long time. Upon receiving the information from the confidential informant, they immediately moved to arrest Holloway; not to obtain a warrant; not to investigate, but to arrest. Holloway's actions after he was accosted by the officers is, unfortunately, irrelevant.[6]

The government challenges this determination, asserting that the officers' intention was to stop Holloway so as to either dispel their reasonable suspicion or, should their suspicion prove valid enough to establish probable cause, arrest him. The government asserts that the officers never had an opportunity to dispel their suspicion and that they seized Holloway only after he attempted to escape--a time when the officers allegedly had probable cause to arrest him.[7]

Our determination of when Holloway was seized for Fourth Amendment purposes is guided by a series of recent Supreme Court

---

[6] Record Excerpts for the United States of America at tab 14, pp. 3-4, *United States v. Michael Anthony Holloway*, No. 91-8044 (5th Cir. filed June 7, 1991) (Order Granting Defendant's Motion to Suppress) (emphasis added) ["Record Excerpts"].

[7] *See infra* Part II.B, which establishes that reasonable suspicion is the prerequisite for a valid investigatory stop while probable cause is required for a valid arrest.

decisions culminating in *California v. Hodari D.*, __ U.S. __, 111 S. Ct. 1547 (1991).[8]  The facts in *Hodari D.* are somewhat analogous to those now before us:  upon a showing of authority by police officers, Hodari D., a juvenile, attempted to flee and was pursued.  Ultimately, Hodari D. was tackled by a police officer, but not until after he had discarded a small rock--a rock which the officers retrieved and determined to be crack cocaine.  The Court held that Hodari was not seized until tackled and that the cocaine he abandoned while fleeing--prior to his seizure--was not the fruit of an illegal seizure.  __ U.S. at __, 111 S. Ct. at 1551.  Specifically, the Court held that "[a]n arrest requires *either* physical force . . . *or*, where that is absent, *submission* to the assertion of authority."  *Id*. (emphasis in original).

Officers Staha and Thompson did carry out a proper show of authority[9]--a show of authority to which Holloway ultimately

_____

[8]     We note that the district court issued its opinion on July 9, 1990 and entered an order denying the government's motion for reconsideration of its order to suppress the cocaine on December 7, 1990.  Since *Hodari D.* was not decided by the Supreme Court until April 23, 1991, the district court did not have the benefit of its guidance in ruling on these motions.  *Hodari D.*'s predecessors include *Alabama v. White*, 496 U.S. 325, __, 110 S. Ct. 2412, 2415-17 (1990) (defining and distinguishing the government's burdens regarding reasonable suspicion and probable cause); *Brower v. Inyo County*, 489 U.S. 593, 596, 109 S. Ct. 1378, 1381-83 (1989) (where a suspect was caught when stolen car he was driving at high speeds to elude pursuing police crashed into police roadblock, holding there was not a "stop" until the suspect crashed into a blockade); *United States v. Sokolow*, 490 U.S. 1, 9, 109 S. Ct. 1581, 1586 (1989) (holding that factors that ordinarily constitute innocent behavior may provide a composite picture sufficient to raise reasonable suspicion).

[9]     *See Brower v. County of Inyo*, 489 U.S. 593, 596, 109 S. Ct. 1378, 1381 (1989).  In *Brower*, police cars with flashing lights chased decedent for 20 miles before he fatally crashed

-8-

refused to submit.  The question before us is, therefore, narrowed to determining whether Holloway was subjected to physical force prior to his attempted escape.[10]  According to Holloway, *Hodari D.* does not require physical touching to affect an "application of physical force with lawful authority to restrain movement"[11] and, therefore, blocking Holloway's path of direction constituted such an application of physical force.

---

into a police-erected blockade.  The issue before the Court was whether this person's death was the consequence of an unreasonable seizure.  The Court, finding that the officers' show of authority did not result in a seizure since the show of authority did not stop decedent, held that:

> a Fourth Amendment seizure does not occur whenever there is a governmentally caused termination of an individual's freedom of movement (the innocent passerby), nor even whenever there is a governmentally caused and governmentally *desired* termination of an individual's freedom of movement (the fleeing felon), but only when there is a governmental termination of freedom of movement *through means intentionally applied.*

*Id*. at 596-97, 109 S. Ct. at 1381 (emphasis in original).  Applying *Brower*, the Court later held that "the test for existence of a `show of authority' is an objective one:  not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person."  *Hodari D.*, __ U.S. at __, 111 S. Ct. at 1551.  In the case before us, officer Staha displayed his badge and both officer Staha and officer Thompson verbally identified themselves as police when Holloway was no more than fifteen feet away and facing them.  Accordingly, we find that this constitutes a proper show of authority.

[10]    Specifically, for incidents where a suspect refuses to submit to an assertion of authority or no such assertion is made, *Hodari D.* defines the term "seizure" as "a laying on of hands or application of physical force to restrain movement, even when it is ultimately unsuccessful."  __ U.S. at __, 111 S. Ct. at 1550.

[11]    Appellee's Brief in Response at 8, *United States v. Michael Anthony Holloway*, No. 91-8044 (5th Cir. filed Aug. 22, 1991).  We are not persuaded, however, that *Hodari D* necessarily applies to an investigatory stop.

*Hodari D.* is not explicit as to whether touching is an essential element of "application of physical force," but we have found no post-*Hodari D.* cases supporting Holloway's proposition that touching is *not* required.[12] To the contrary, the emphasis on touching within *Hodari D.*'s analysis suggests that the Court may have assumed touching to be an element of "application of physical force." *Hodari D.*, __ U.S. at __, 111 S. Ct. at 1550 ("If, for example [the officer] had laid his hands upon Hodari to arrest him, but Hodari had broken away and had *then* cast away the cocaine, it would hardly be realistic to say that disclosure had been made during the course of an arrest.") (emphasis in original).[13] Applying the Court's *Hodari D.* analysis to

_____

[12] Holloway cites *Terry v. Ohio*, 392 U.S. 1, 19 n.16, 88 S. Ct. 1868, 1879 n.16 (1968), in support of this proposition. This *Terry* footnote does not define "physical force" and, in fact, *Terry* involved touching: "Officer McFadden `seized' petitioner and subjected him to a `search' when he took hold of him and patted down the outer surfaces of his clothing." *Id.* at 21, 88 S. Ct. at 1879.

[13] In *Hodari D.*, the Court also held that:
To constitute an arrest, however--the quintessential `seizure of the person' under our Fourth Amendment jurisprudence--the mere grasping or application of physical force with lawful authority, whether or not it succeeded in subduing the arrestee, was sufficient. . . . As one commentator has described it:
"There can be constructive detention, which will constitute an arrest, although the party is never actually brought within the physical control of the party making an arrest. This is accomplished *by merely touching*, however slightly, the body of the accused, by the party making the arrest and for that purpose, although he does not succeed in stopping or holding him even for an instant; as where the bailiff had tried to arrest one who fought him off by the fork, the court said, `If the bailiff had touched him, that had been an

-10-

*Holloway*, Staha and Thompson never laid their hands upon Holloway--they never even came within fifteen feet of Holloway's person until after he attempted to flee and damaged his vehicle beyond repair[14]--and, in fact, Holloway was able to break away from officers Staha and Thompson and travel far enough to pick up enough speed to irreparably damage both his vehicle and the one occupied by officers Duty and Clark.  Only then was Holloway's movement restrained--meaning *under the* officers' control.

This court has held that:

　　　　arrest. . . .'"  A. CORNELIUS, SEARCH AND SEIZURE
　　　　163-164 (2d ed. 1930) (footnote omitted)
*Id*. (citations omitted) (emphasis added).
　　This *Hodari D.* holding appears determinative for our purposes. The only obvious distinction between the *Hodari D.* facts and those in *Holloway* is that, while attempting to back away from officers Staha and Thompson, another police vehicle moved up from behind Holloway, thereby boxing him in and giving Holloway a lesser opportunity to escape than that enjoyed by Hodari D.  However, Holloway was still not under the officers' control--an observation evidenced by the fact that Holloway was able to slam into the unit behind him, travelling far enough to pick up enough speed to damage both vehicles beyond repair.  In fact, Holloway hit with enough force to buckle the driver's seat he occupied.  A photograph of the totalled vehicles, entered into evidence as "Government Exhibit G-2," reveals that the entire trunk of Holloway's vehicle is virtually resting on the ground.

[14]　　Officer Staha testified as follows:
Q　　So then when you say you were--"you were 10 feet away," you were 10 feet away from the bumper?
A　　In front of the bumper, right.
Q　　All right.  So it was actually maybe 15 or 17 feet to actually where the Defendant was sitting, is that correct?
A　　Approximately.
　　　　　　　　　　* * *
Q　　All right.  So the windows, then, were all the way up on this vehicle, and you were maybe 15 feet away from the driver, and your partner was maybe just a little--
A　　About the same.
Record on Appeal, vol. 3, at 25 (testimony of officer Staha)

> The line between a valid investigatory stop and an arrest requiring probable cause is a fine one. *United States v. Hanson*, 801 F.2d 757 (5th Cir. 1986). Although there is no litmus test for making this determination, an investigation detention must last no longer than is necessary to effect the purposes of the stop and should employ the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time. *Florida v. Royer*, 460 U.S. 491, 500, 103 S. Ct. 1319, 1325, 75 L.Ed.2d 229 (1983). *See also United States v. Sharpe*, 470 U.S. 675, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985).

*United States v. Zukas*, 843 F.2d 179, 182 (5th Cir. 1988), *cert. denied*, 490 U.S. 1019, 109 S. Ct. 1742.[15] Applying this holding to *Holloway*, officers Staha and Thompson had reason to suspect that Holloway was carrying drugs,[16] and they acted to stop him from driving away before they had an opportunity to dispel their suspicion. The officers did block Holloway's path of travel and bring him to a complete stop which lasted long enough for them to fully and directly confront Holloway and identify themselves, and

---

[15] The *Zukas* facts at least loosely parallel those now before us. Officers observed their suspects and, when it became apparent that the suspects were making final flight preparations, the officers parked their car in front of the suspects' plane so as to block its access to the runway. The officers then approached the pilot and asked for identification and registration papers which they retained and, after questioning the suspects further, the officers then obtained consent to search the plane and found a bag containing cocaine. *Id*. at 181. We held that:

> Although both sides agree that the search was voluntary, it cannot be justified if the preceding level of intrusion made the seizure a *de facto* arrest before the consent was given, as Zukas argues was the case. We hold, however, that, based upon the totality of the circumstances, the level of intrusion prior to the consent search was no more than was necessary to dispel the officers' legitimate suspicions.

*Id*. at 183.

[16] *See supra* note 1; *see generally infra* Part II.B.

long enough for officers Clark and Duty to approach Holloway from behind, thereby limiting Holloway's mobility.[17]  However, the initial stop by Staha and Thompson was extremely brief and never approached being intrusive since, rather than allowing the officers to conduct their investigation, Holloway decided to flee.

Finally, in accepting Holloway's contention that "assertion of physical force" includes officers Thompson and Staha blocking his path of travel, the district court was apparently influenced by its own determination that the officers had the subjective intent to arrest Holloway.[18]  The law on this point is well-settled:  courts are precluded from giving weight to the subjective intent of the police officers.[19]

---

[17]    These facts somewhat distinguish *Holloway* from *Hodari D.*, __ U.S. __, 111 S. Ct. 1547 (1991).  Specifically, Hodari D. was one of a pack of youths who fled as he saw an officer's car approaching.  Accordingly, the Court held that Hodari D. was not seized for Fourth Amendment purposes until tackled by the officer pursuing him.  *Id*. at __, 111 S. Ct. at 1552.

[18]    *See supra* note 6 and accompanying text.

[19]    For example, in *United States v. Robinson*, 414 U.S. 218, 94 S. Ct. 467 (1973), the defendant challenged his search on the ground that the officers' motivation for the search did not coincide with the officers' legal justification for carrying it out.  The Supreme Court rejected defendant's argument and held that the courts must examine challenged searches under a standard of objective reasonableness without regard to the underlying intent or motivation of the officers involved.  *Id*. at 235, 94 S. Ct. at 477; *see also Maryland v. Macon*, 472 U.S. 463, 470-71, 105 S. Ct. 2778, 2782-83 (1985); *United States v. Villamonte-Marquez*, 462 U.S. 579, 584 n.3, 103 S. Ct. 2573, 2577 n.3 (1983); *Scott v. United States*, 436 U.S. 128, 138, 98 S. Ct. 1717, 1723 (1978); *United States v. Zukas*, 843 F.2d 179, 183 (5th Cir. 1988) ("[officer's] subjective intent is not important in determining whether an arrest was made"), *cert. denied*, 490 U.S. 1019, 109 S. Ct. 1742; *United States v. Causey*, 834 F.2d 1179, 1184 (5th Cir.

-13-

In sum, we find that, (i) since Holloway was in the process of driving away, stopping Holloway was the least intrusive means available for officers Thompson and Staha to dispel their suspicion (*see Zukas*, 843 F.2d at 183), (ii) Holloway was fully stopped and confronted by officers Thompson and Staha but failed to submitted to their initial show of authority, (iii) Holloway was never under the officers' physical control even though his mobility was limited by officers closing in on him, and (iv) that this stop--an effort by officers Staha and Thompson to search Holloway for drugs to dispel their suspicion--was, due to Holloway's attempted escape, extremely brief and nonintrusive. Accordingly, we hold that the initial stop of Holloway by officers Staha and Thompson was not a de facto arrest[20] and, applying the Supreme Court's holding in *Hodari D.*, we further

_____

1987) (en banc) ("[S]o long as police do no more than they are objectively authorized and legally permitted to do, their motives in doing so are irrelevant and hence not subject to inquiry.") (footnote omitted).

[20] In a situation where an officer's suspicion was supported only by a receipt indicating that the suspect had purchased chemicals known to be used in the manufacture of controlled substances, this court held:

> Agent Harr's suspicions were aroused for the first time at the offices of Aldrich and as the two were driving off. Because he did not know their names or where they were heading, the stop on the highway was a reasonable means of confirming or dispelling his suspicions. The method of the stop--blocking the Oldsmobile, ordering the occupants out of the car, and patting them down for weapons--is a reasonable means of effecting the stop and ensuring the safety of the officers and does not convert the stop into a de facto arrest.

United States v. Martinez, 808 F.2d 1050, 1053 (5th Cir. 1987) (footnote omitted); see also *supra* note 2.

hold that Holloway was not arrested until after he attempted to flee and ended up under the officers' physical control.

**B**

Having applied *Hodari D.* to the facts before us and determined that the initial contact between Holloway and officers Staha and Thompson does not constitute an arrest but, rather, constitutes an effort by these officers to investigate their suspicion that Holloway was carrying drugs, we now must consider whether the officers had the requisite *reasonable* suspicion to initiate that detention.[21]  "The ultimate determination of reasonableness in investigatory stop cases is . . . a conclusion of law."  *United States v. Basey*, 816 F.2d 980, 988 (5th Cir. 1987).  Therefore, this court may freely review such district court conclusions.

This court has defined an investigatory stop as "a brief seizure that must be supported by reasonable suspicion, that is[,] `specific and articulable facts, which taken together with rational inferences from these facts reasonably warrant an intrusion.'"  *United States v. Zukas*, 843 F.2d 179, 181 (5th Cir. 1988), *cert. denied*, 490 U.S. 1019, 109 S. Ct. 1742 (1989), *quoting Terry*, 392 U.S. at 21, 88 S. Ct. at 1880 (1968).  The Supreme Court has been even more specific:

> The officer, of course, must be able to articulate something more than an "inchoate and unparticularized

_____

[21]     Under *Terry* and its progeny, a temporary investigatory stop is proper if the stop is based on reasonable suspicion "that criminal activity may be afoot . . . ."  392 U.S. at 30, 88 S. Ct. at 1884.

-15-

suspicion or `hunch'."  The Fourth Amendment requires
"some minimal level of objective justification" for
making the stop.  That level of suspicion is
considerably less than proof of wrongdoing by a
preponderance of the evidence.  We have held that
probable cause means "a fair probability that
contraband or evidence of a crime will be found," and
the level of suspicion required for a *Terry* stop is
obviously less demanding than that for probable cause.

*United States v. Sokolow*, 490 U.S. 1, 7, 109 S. Ct. 1581, 1585

(1989) (citations omitted).

To determine whether officers Staha and Thompson had

reasonable suspicion to stop Holloway, we must consider the

"totality of the circumstances," meaning that "[b]oth factors--

quantity and quality [of information relied upon]--are considered

in the `totality of the circumstances--the whole picture,' *United*

*States v. Cortez*, 449 U.S. 411, 417, 101 S. Ct. 690, 695 (1981),

that must be taken into account when evaluating whether there is

reasonable suspicion."  *Alabama v. White*, 496 U.S. 325, __, 110

S. Ct. 2412, 2416 (1990).  Factors that ordinarily constitute

innocent behavior may provide a composite picture sufficient to

raise reasonable suspicion in the minds of experienced[22] officers

such as Staha and Thompson.  *See Sokolow*, 490 U.S. at 9, 109 S.

---

[22]    We must consider the collective knowledge and
experience of the officers involved--that is we must look at "the
sum total of layers of information and the synthesis of what the
police have heard, what they know, and what they observed as
trained officers.  We weigh not the individual layers but the
`laminated' total."  *United States v. Edwards*, 577 F.2d 883, 895
(5th Cir.), *cert. denied*, 439 U.S. 968, 99 S. Ct. 458 (1978)
(citation omitted)*; see also United States v. Gerry*, 845 F.2d 34,
37 (1st Cir. 1988).

-16-

Ct. at 1586-87 (1989).[23]  Moreover, "[t]he reasonableness of the officer's decision to stop a suspect does not turn on the availability of less intrusive investigatory techniques."  *Id. at 11*, 109 S. Ct. at 1587.[24]

The totality of information available to officers Staha and Thompson justifies their reasonable suspicion that Holloway was involved in criminal activity:

   **--** A reliable informant--that is, an informant who had provided reliable information to officers in the past regarding individuals who possessed and sold crack cocaine--stated that Holloway was a crack dealer;[25]

   **--** The informant described Holloway's possession of cocaine as part of an ongoing activity (specifically, the informant told the officers that Holloway often sold crack cocaine at the corner of Rosewood and Poquito Streets), and stated that he had just been with Holloway and seen him in possession of and selling crack cocaine;[26]

---

[23]  For example, a tip from a confidential informant which is sufficiently corroborated, as is true in *Holloway*, may furnish the requisite reasonable suspicion to make and investigative stop.  *See United States v. Rodriquez*, 835 F.2d 1090, 1092 (5th Cir. 1988); *United States v. Gomez*, 776 F.2d 542, 546-48 (5th Cir. 1985).

[24]  The defendant in *Sokolow* was stopped as he was about to get into a cab and later asserted that, rather than forcibly detaining him, agents should have opted for the "least intrusive means reasonably available to dispel their suspicion" and simply approached and spoken with him.  The Court disagreed, holding that "[s]uch a rule would unduly hamper the police's ability to make swift on-the-spot decisions . . ."  *Id*.  This is especially true in a situation such as that in *Holloway* where the defendant was actually in a vehicle and in the process of driving away.

[25]  *See supra* note 1 and accompanying text.

[26]  *Id.; see also* Record on Appeal, vol. 3, at 13-20 (testimony of officer Staha):
   Q   . . . . [The confidential informant] was debriefed on the street.  And at that time, he indicated to you that he had seen the Defendant in possession of "Crack"

**--** The informant's credibility was enhanced by his ability to provide supportive details:  he told officers (i) exactly where Holloway could be found, (ii) the color, style, and license plate number of the car Holloway would be driving, and (iii) exactly where on Holloway's person cocaine was hidden;[27]

**--** Officer Staha confirmed the informant's information through personal knowledge--information collected from other informants and sources--gained while working the streets as a uniformed officer;[28] and

_____

cocaine a time before -- a brief time before that, is that correct?
A    Yeah, just moments before we went to the area.
Q    All right.  How long, an hour, a half hour?
                    * * *
Q    . . . . Officer Thompson indicated that the confidential informant reported the possession to take place approximately a half hour before the debriefing?
A    I can--I would agree with that.
                    * * *
Q    [The informant] had seen him actually selling a half hour before, is that correct?
A    That's correct.
Q    All right.  And your debriefing took approximately how long, Officer?
A    Oh, 15 minutes.
Q    And then after that debriefing, what did you do?
A    We proceeded to the area with the informant, he pointed out the car to us, and then as I recall, the informant was released at the scene--

[27]    *See supra* note 1 and accompanying text.

[28]    *Id.; see also* Record on Appeal, vol. 3, at 11 (testimony of officer Staha):
Q    So now, after you've seen this wreck, what's the next thing that happens?
A    Thompson and I approached the car, Thompson--the seat buckled from the wreck. . . .  There's no doubt that Holloway knew who I was, knew I was a police officer.
Q    Now, why is there no doubt?
A    Well, unfortunately when I worked east Austin, I was titled with a nickname. . . . Besides saying my last name, Staha, he said the nickname to me, too.
Q    Tell the Judge, to the best of your memory, what the Defendant said when he was taken out of the car.
A    He said, "Staha, why are you always messing with me?"  And then he said--which is the nickname--he said,

**--** The officers knew that Holloway had recently been released from the penitentiary after serving time on a conviction involving possession of narcotics.[29]

In short, "[a]ny one of these factors is not by itself proof of any illegal conduct . . . . [b]ut we think taken together they amount to reasonable suspicion." *Sokolow*, 490 U.S. at 9, 109 S. Ct. at 1586. Accordingly, we hold that the officers had reasonable suspicion and that the investigatory stop of Holloway's car was proper.[30]

Finally, we must consider whether, after his attempt to escape, the officers had probable cause to arrest Holloway. "Probable cause for an arrest exists when reasonably trustworthy facts and circumstances are within the knowledge of the arresting officers to warrant a reasonable belief that an offense has been or is being committed." *Costner*, 646 F.2d at 236. To make such a determination, this court must embark upon an objective assessment of the officers' actions in light of the facts and

---

"`Fathead,' why you"--and he cursed at me--"why are you always fuckin' with me?"

[29]     *See supra* note 1 and accompanying text.

[30]     In *United States v. Costner*, 646 F.2d 234 (5th Cir. 1981), we held:

The officers had been given descriptions of both robbers and knew the license plate numbers of the getaway truck. The license plate check directed the officers to Baldwin's residence at which time a car was seen heading for Baldwin's driveway. The officers decided to inquire into the identities of the passengers since two of the occupants fit the general physical descriptions of the robbers. These factors were more than sufficient to create reasonable suspicion in the minds of the officers to stop the Plymouth.

*Id*. at 236. Officers Staha and Thompson had at least this much reason to suspect Holloway of criminal activity.

circumstances confronting them at the time. *See United States v. Basey*, 816 F.2d 980, 990-91 (5th Cir. 1987). We have held that, where police officers clearly identify themselves, an attempt to flee "ordinarily supplies another element to the reasonable suspicion calculus" and "may occasionally serve as the catalyst to convert mere reasonable suspicion to probable cause." *United States v. Amuny*, 767 F.2d 1113, 1124 (5th Cir. 1985).[31] Applying these principles to the case before us, we find that Holloway's attempt to escape from officers Staha and Thompson, irreparably damaging his vehicle and a police unit in the process, was a sufficient additional factor to push the officers' reasonable suspicion over the threshold of probable cause. *See Costner*, 646 F.2d at 236.[32]

_____

[31] Specifically, in *Amuny* we held that:

If a police officer identifies himself while approaching a suspect and the suspect flees, the suspect's conduct suggests that he knowingly seeks to evade questioning or capture. Such conduct ordinarily supplies another element to the reasonable suspicion calculus . . . but may occasionally serve as the catalyst to convert mere reasonable suspicion to probable cause.

*Id*. (but ultimately holding that defendant's flight from scene was ambiguous conduct and insufficient to support finding of probable cause); *see also Sibron v. New York*, 392 U.S. 40, 66-67, 88 S. Ct. 1889, 1904 (1968) ("[D]eliberately furtive actions and flight at the approach of strangers or law officers are strong indicia of *mens rea*, and when coupled with specific knowledge on the part of the officer relating the suspect to the evidence of crime, they are proper factors to be considered in the decision to make an arrest.").

[32] In fact, even without Holloway's attempt to escape, the totality of information available to officers Staha and Thompson may have constituted probable cause. *See infra* notes 25-29 and accompanying text.

### III

Finding that Holloway's arrest was lawful, that the search of his person revealing cocaine was incident to that lawful arrest, and that the cocaine found concealed in Holloway's undergarments should not be suppressed, we REVERSE the district court's order suppressing that evidence and REMAND this case for trial.