IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

July 14, 2008

Charles R. Fulbruge III
Clerk

No. 07-30814

UNITED STATES OF AMERICA

Plaintiff - Appellant

v.

BOBBY TUGGLE, JR

Defendant - Appellee

Appeal from the United States District Court
for the Middle District of Louisiana, Baton Rouge
USDC No. 3:07-CR-50-1

Before KING, WIENER, and ELROD, Circuit Judges.

PER CURIAM:[*]

Defendant-Appellee Bobby Tuggle, Jr., was charged with possessing a firearm as a convicted felon. The government appeals the district court's granting of Tuggle's motion to suppress the seized firearm. We reverse and remand.

I.

On March 7, 2007, Bobby Tuggle, Jr., was indicted on one count of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). On April

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

19, 2007, Tuggle filed a motion to suppress the firearm, arguing that it was the fruit of an unconstitutional search and seizure. A hearing on the motion was held on August 21, 2007. Officer Timothy Wilkinson was the only witness to testify at the hearing. He testified to the following events, which, according to the government, establish reasonable suspicion for the Terry stop and frisk of Tuggle. See Terry v. Ohio, 392 U.S. 1 (1968).

At the time of the stop, Officer Wilkinson, an officer in the auto-theft division of the Baton Rouge Police Department ("BRPD"), had been investigating an auto-theft ring at the Baton Rouge Metropolitan Airport where fifty to sixty vehicles had been stolen. On January 4, 2006, it was reported that a couple of the stolen vehicles, as well as the suspects involved, were located at 2915 Chippewa Street, and Wilkinson proceeded to that address. Wilkinson had specific information that the boyfriend of the woman living at the Chippewa residence was involved in the auto-theft ring. Although he had the boyfriend's name, Wilkinson did not have a physical description.

The Chippewa residence, according to Wilkinson, was located in a high crime area known for narcotics and street crimes. Specifically, Wilkinson testified that several years prior to the auto-theft investigation, he had been involved in narcotics arrests on Chippewa, and that more recently he had examined police reports indicating narcotics activity there. Wilkinson was also aware of a shooting that occurred on the particular block involved in this case. However, he "couldn't tell [defense counsel] for sure" whether narcotics arrests had been made in the last two years on Chippewa Street.

When Wilkinson arrived on Chippewa, he made an initial pass by the address in an unmarked police vehicle. He noticed two vehicles parked in the yard of the residence, "even [with], but towards the back part of the house." Wilkinson copied down the license plate number of one of the vehicles visible from the road, ran the plate, and confirmed that the vehicle was stolen. He then

notified the BRPD Uniform Patrol Division and requested assistance in returning to the residence to investigate and recover the stolen vehicle.

Within approximately ten to fifteen minutes, Wilkinson, accompanied by other BRPD officers, returned to the Chippewa residence where he had identified the stolen vehicle. BRPD Officer Steven Parks, who was traveling in a marked BRPD car, drove up to the residence behind Wilkinson. Additional BRPD officers in marked units arrived upon the scene within a "matter of seconds." As Wilkinson and Parks approached the residence, they observed a car stopped in the middle of the roadway. Its motor was running and a "black male," later identified as Tuggle, was leaning into its driver's side window. As the officers pulled up, the vehicle "sped away." At that point, Tuggle turned and "briskly walked away" from the officers and toward the stolen vehicle parked in the yard of the Chippewa residence. According to Wilkinson, based on his experience and the criminal nature of the neighborhood, Tuggle's posture and behavior at the car were consistent with a street-level narcotics transaction. Further, because Tuggle subsequently approached the stolen vehicle, Wilkinson testified that he inferred that Tuggle might be one of the suspects involved in the auto-theft ring.

According to Wilkinson, Tuggle traveled about ten to fifteen feet away from the street and into the yard of the residence and was approximately fifteen feet away from the stolen vehicle when the officers called out to him to come back to their location. Yielding to their command, Tuggle turned around and headed back to the street. Wilkinson testified that when Tuggle reached the officers, he was "very nervous" and "shaking uncontrollably." The officers conducted a patdown and discovered that Tuggle was carrying a .38 caliber revolver in his back left pocket. Tuggle was placed under arrest for illegally carrying a weapon. Thereafter, the officers recovered both vehicles in the yard, after confirming the second was also stolen.

Before making its decision on the motion to suppress, the district court asked Wilkinson whether Chippewa Street had sidewalks. Wilkinson replied that it did not. The district court then surmised that anyone walking down the side of the street of the Chippewa residence would necessarily be walking toward the stolen vehicle. Wilkinson responded that a person simply walking down the street would not need to travel approximately fifteen feet into the yard of the Chippewa residence and come within fifteen feet of the stolen vehicle, as Tuggle allegedly had. The district court was also curious about what happened with the car and driver who had "sped away." Wilkinson had testified that BRPD Officer Gewalt went after the vehicle, and the district court was interested in knowing what came of the stop. It found the fact that Wilkinson did not question Gewalt about his stop of the vehicle odd, stating, "If you thought you had a drug deal why didn't you talk to one of the officers that followed up on the drug deal?" Wilkinson replied, "Well [Gewalt] came back to our location within just a couple of minutes[,] and there was nothing to the stop that he had made."

At the conclusion of the hearing, the district court found that the police lacked reasonable suspicion for a Terry stop and frisk of Tuggle on the date in question. First, discussing the "supposed drug deal," the district court stated:

> [T]he reasonable suspicion on that point is that [Tuggle] was standing at or leaning in the driver's window of a vehicle that was stopped in the middle of the street. And when the police pulled up the vehicle pulled off, sped off and [Tuggle] walked away in a [manner] that was described as a brisk walk. None of those facts taken alone or together would provide reasonable suspicion that a drug offense was either occurring or about to occur. After the officers pulled up there was testimony that one of the officers pursued and stopped the car that had sped away. But Officer Wilkinson couldn't say what happened after that because apparently nothing was told to him by the officer who stopped the vehicle. It strikes me as strange that if you think there's a drug deal going on, and the car allegedly

4

> involved in the drug deal is stopped, seems to me somebody ought to say something about what happened after the car was stopped, why there wasn't an arrest of the driver. Or if there was an arrest of the driver, what was found, and that sort of thing. There's none of that in this case.

The district court next discussed the "other articulable reason for the stop"—the fact that Tuggle briskly walked away from the officers and toward the stolen vehicle. The district court concluded that this evidence similarly failed to establish reasonable suspicion to believe criminal activity was afoot. In making that determination, the district court noted that walking toward a stolen vehicle is not a crime in itself, that there was no evidence connecting Tuggle to the stolen vehicle, and that the cars were parked in a yard apparently open to the street so that "anybody walking in that area was going to walk either towards or in the area of those stolen vehicles." The district court then turned to the legality of the frisk and concluded that "there's no evidence at all to indicate that the officers had a reasonable belief that they were dealing with an armed individual prior to the time that the defendant was stopped." Accordingly, the district court granted Tuggle's motion to suppress the seized firearm. Thereafter, the government filed a timely notice of appeal.

## II.

"In reviewing a district court's ruling on a motion to suppress, we review questions of law de novo, and accept the trial court's factual findings unless they are clearly erroneous." United States v. Castro, 166 F.3d 728, 731 (5th Cir. 1999) (en banc). "In reviewing findings of fact, we view the evidence in the light most favorable to the party prevailing below," which in this case is the defendant, Tuggle. United States v. Lopez-Moreno, 420 F.3d 420, 429 (5th Cir. 2005) (citing United States v. Shelton, 337 F.3d 529, 532 (5th Cir. 2003)). "If this review leads us to the 'definite and firm conviction that a mistake has been committed[,]' then the district court's factual finding must be deemed clearly erroneous." Id. at

429–30 (quoting Payne v. United States, 289 F.3d 377, 381 (5th Cir. 2002)). Also, the district court's determination of whether the facts provided reasonable suspicion is a conclusion of law reviewed de novo. Id. at 430 (citing Ornelas v. United States, 517 U.S. 690, 699 (1996)); see also United States v. Holloway, 962 F.2d 451, 459 (5th Cir. 1992). In evaluating the reasonableness of an officer's actions, "due weight" must be given to the facts and inferences viewed "in light of [the officer's] experience." United States. v. Michelletti, 13 F.3d 838, 841 (5th Cir. 1994) (en banc) (quoting Terry, 392 U.S. at 27).

### III.

The government challenges the district court's decision to grant the motion to suppress, arguing first that the district court erred by addressing and rejecting Wilkinson's observations separately, rather than considering the "totality of the circumstances of the stop" in its analysis. The government next argues that the district court erred by focusing on Wilkinson's failure to inquire about the fate of the vehicle that sped off as a basis for discounting Wilkinson's observations. The government submits that the failure to learn about, or present testimony of, any evidence recovered after the stop does not negate Wilkinson's suspicions of narcotics trafficking based on the facts observed at the time of the stop. Further, contrary to the district court's conclusion that no facts were presented supporting Wilkinson's belief that Tuggle could be a member of the auto-theft operation, the government points to Tuggle's hurried retreat toward the stolen car. And, finally, the government avers that the officers reasonably believed that Tuggle was armed and dangerous based in part on their suspicion of narcotics trafficking since "weapons are tools of the trade of narcotics traffickers."

In response, Tuggle asserts that the district court's decision to suppress the firearm evidence was proper considering that the government only proved that there was a stolen vehicle in the area where Tuggle was located, and that

Tuggle was walking in that direction. Tuggle maintains that this was insufficient to warrant reasonable suspicion that Tuggle was, or was about to be, engaged in criminal activity. Tuggle also notes that although Wilkinson testified to the suspected narcotics trafficking at the hearing, he did not include his suspicions in his police report. According to Tuggle, this failure undermined Wilkinson's credibility with the district court. Tuggle further maintains that the district court correctly found that there was simply no evidence on the issue whether the officers had reasonable suspicion to believe that Tuggle was armed and dangerous.

The legality of police investigatory stops is tested in two parts. United States v. Brigham, 382 F.3d 500, 506 (5th Cir. 2004) (en banc). We "first examine whether the officer's action was justified at its inception, and then inquire whether the officer's subsequent actions were reasonably related in scope to the circumstances that justified the stop." Id. (citing Terry, 392 U.S. at 19–20). Pursuant to Terry, "[p]olice officers may briefly detain individuals on the street, even though there is no probable cause to arrest them, if they have a reasonable suspicion that criminal activity is afoot. The Fourth Amendment requires only some minimum level of objective justification for the officers' actions—but more than a hunch—measured in light of the totality of the circumstances." Michelletti, 13 F.3d at 840 (en banc) (citations omitted). "Reasonable suspicion must be supported by particular and articulable facts, which, taken together with rational inferences from those facts, reasonably warrant an intrusion." Id. (citation omitted).

Of course, "the policeman making a reasonable investigatory stop should not be denied the opportunity to protect himself from attack by a hostile suspect." Adams v. Williams, 407 U.S. 143, 146 (1972). The Court in Terry thus held that "[w]hen an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently

dangerous to the officer or to others," he may conduct a limited protective search for concealed weapons. Terry, 392 U.S. at 24. An officer need not be certain that an individual is armed; the issue is whether a reasonably prudent man could believe, based on "specific and articulable facts," that his safety or that of others is in danger. Michelletti, 13 F.3d at 840–41 (citing Terry, 392 U.S. at 27).

"In assessing the reasonableness of an officer's actions, it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search warrant a man of reasonable caution in the belief that the action taken was appropriate?" United States v. Rideau, 969 F.2d 1572, 1574 (5th Cir. 1992) (en banc) (quoting Terry, 392 U.S. at 22) (internal quotation marks omitted). This inquiry does not depend on the "officer's state of mind, or his stated justification for his actions." Id. (citing Maryland v. Macon, 472 U.S. 463, 470–71 (1985)). Instead, the Fourth Amendment is satisfied "[a]s long as all the facts and circumstances, viewed objectively, support the officer's decisions." Id. In short, "[w]e must attempt to put ourselves in the shoes of a reasonable police officer as he or she approaches a given situation and assesses the likelihood of danger in a particular context." Id.

A.

In finding that the officers' initial stop of Tuggle was not justified by reasonable suspicion, the district court erroneously split the evidence into two discrete events—the suspected drug deal and the quick retreat toward the stolen vehicle. The correct approach under Terry is to objectively examine the "totality of the circumstances." And, although the standards of reasonableness are "not readily . . . reduced to a neat set of legal rules," Ornelas, 517 U.S. at 695–96 (citation omitted), some factors considered germane to a reasonable suspicion analysis include: whether the area where the stop occurred was a high crime area or one "of expected criminal activity," Illinois v. Wardlow, 528 U.S. 119, 124

(2000); whether the individual engaged in "unprovoked flight upon noticing the police," id.; and whether the individual looked nervous or made furtive gestures or suspicious movements, United States v. Watson, 953 F.2d 895, 897 (5th Cir. 1992). For example, the defendant in Wardlow fled upon seeing police cars converge in an area known for having heavy drug activity. 528 U.S. at 122. In analyzing whether the officers had reasonable suspicion to pursue the defendant, the Supreme Court noted that while a person's presence in a high crime area is not enough, standing alone, to create reasonable suspicion, it is among the relevant contextual factors that may be considered. Id. at 124. Likewise, "nervous, evasive behavior" is appropriate to a reasonable suspicion analysis, explained the Court. Id. "Headlong flight—wherever it occurs—is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such." Id.

At the suppression hearing in this case, Wilkinson, who had been a member of BRPD for twenty years—ten years in auto-theft, eight years in Uniform Patrol, and two years in General Detectives Division—testified that he was cognizant of the criminal characteristics of the Chippewa neighborhood when he proceeded to the residence to investigate the auto-theft ring. The district court was unwilling to credit this testimony, stating, "Where is my evidence that this was a high crime area? The officer was asked about that and the best he could [ ] tell me [was that] a couple of years ago, there was some drug deals, as far as he knew." The district court was referring to Wilkinson's admission on cross-examination that he had no definitive information regarding narcotics arrests made on that block within the past two years. In focusing on this admission, the district court disregarded Wilkinson's earlier testimony about the neighborhood's criminal reputation. In particular, Wilkinson testified that he was familiar with the criminality of the area, as he had been with BRPD for twenty years; that he had examined police reports detailing recent criminal

activity in the area before driving out to the Chippewa residence; that he had made prior arrests for narcotics activities on Chippewa Street itself; and that he was aware of a shooting on the block where the residence was located. Looking at the evidence on the whole, even in the light most favorable to Tuggle, we conclude that the district court clearly erred in finding that Wilkinson provided no evidence that this was a high crime neighborhood. Moreover, rather than ignoring the criminal nature of the neighborhood in its Terry analysis, the district court should have recognized, at a minimum, that Wilkinson was aware that the neighborhood was once regarded as "high crime."[1] See, e.g., United States v. Beck, 602 F.2d 726, 729 (5th Cir. 1979) (considering that the officer was conscious of the neighborhood's high-crime characteristics along with the fact that "there was no evidence of recent crimes in the neighborhood" in conducting a totality of the circumstances analysis for reasonable suspicion). Still, as previously stated, mere presence in a high crime area, without more, will not create reasonable suspicion for a Terry stop and frisk. See Brown v. Texas, 443 U.S. 47, 52 (1979).

Wilkinson also testified that after calling for back-up and returning to the residence with marked police vehicles, he noticed a car stopped with its engine running in front of the residence, obstructing his path down Chippewa Street. Tuggle was leaning into the driver's side window at that time. Wilkinson averred that Tuggle's posture beside the stopped car was consistent with a street-level drug transaction. Although the district court accepted Wilkinson's factual depiction of the scene, it discounted the testimony regarding a narcotics transaction because Wilkinson failed to follow up with Gewalt, the officer who pursued the vehicle that fled the scene. The government argues that such an

---

[1] We note that even if Wilkinson had been aware that arrests in the area had recently decreased, his suspicions of continuing criminal activity there were confirmed when he determined that one of the cars parked at the residence was in fact stolen.

inquiry is not legally relevant because a finding of reasonable suspicion does not depend on facts revealed only after a stop has occurred. See, e.g., United States v. Espinoza-Seanez, 862 F.2d 526, 533 (5th Cir. 1988) (explaining that information gathered after a stop cannot be used to justify the stop); United States v. Frisbie, 550 F.2d 335, 338 (5th Cir. 1977) ("An observation made after and caused by a stop cannot be bootstrapped into grounds for reasonable suspicion warranting the stop."). However, the district court was not attempting to justify the stop by determining whether the vehicle was in fact cited for a narcotics offense. Instead, the district court found it less likely that Wilkinson actually believed a narcotics transaction was being conducted based on his failure to talk to Gewalt and discover the fate of the vehicle that sped away.

Nonetheless, the district court's analysis on this point is flawed for two reasons. First, there was no need for Wilkinson to ask Gewalt what happened in light of Wilkinson's testimony that Gewalt returned to the Chippewa location within "just a couple of minutes" and that, as he understood, "there was nothing to the stop that [Gewalt] had made." Second, and more importantly, what Wilkinson subjectively thought is not the relevant inquiry—reasonable suspicion must be judged against an objective standard. See Rideau, 969 F.2d at 1574 (en banc) ("The officer's state of mind, or his stated justification for his actions, is not the focus of our inquiry.") (emphasis added). "As long as all the facts and circumstances, viewed objectively, support the officer's decisions, the Fourth Amendment is satisfied." Id. Because we conclude that the other specific and articulable facts presented, viewed objectively and as a whole, created enough reasonable suspicion for the stop, it is unnecessary for us to determine whether an experienced officer, such as Wilkinson, would have reasonably suspected

criminal activity, or more specifically a narcotics transaction, solely from Tuggle's interaction with the driver of the stopped car.[2]

On that note, we turn our attention to Wilkinson's testimony that upon the officers' arrival in marked police cruisers, the car running idle in the roadway "sped off," and Tuggle similarly turned and briskly walked into the yard of the residence. Again, the district court accepted the validity of these observations, but suggested in its Terry analysis that because Tuggle did not run from the police, it was unreasonable for the officers to believe that he was intentionally evading them. However, the defendant does not have to run away for his behavior to be considered unprovoked flight. See, e.g., United States v. Gordon, 231 F.3d 750, 757 (11th Cir. 2000) ("Obviously the speed of the suspect's movements may be relevant in the totality of the circumstances, but the fact that the suspect walked very quickly, as opposed to ran, away from the spot where he was sighted by police does not itself change the analysis where it is evident from the circumstances that he was attempting to flee upon sighting the police."). Indeed, the fact that the vehicle had just sped off makes it objectively more reasonable to assume that Tuggle was also trying to flee from the police when he immediately thereafter turned and briskly walked away from the officers. Further, even if we were to accept Tuggle's argument that he was not "in flight," the flight of the vehicle, into which Tuggle had been leaning, provides support for the officers' suspicion that he was involved in some kind of wrongdoing. Cf. United States v. Newman, 472 F.3d 233, 237 (5th Cir. 2006) ("While the fact that a man dashed out of the house, by itself, is not enough to create probable cause to search the house, . . . it is among the relevant contextual considerations in the probable cause analysis."); see also United

---

[2] Because we find it unnecessary to consider the officers' inference of narcotics trafficking, we do not address Tuggle's argument that because Wilkinson did not include the purported narcotics transaction in his police report, his testimony on this subject should not be credited.

States v. Miles, 275 F.3d 1078, No. 00-11425, 2001 WL 1465241, at *3 (5th Cir. 2001) (unpublished) ("Although [the defendant] was not the one who fled, the flight of a person standing near his automobile provided further reason to support the Officers' suspicion of [the defendant's] involvement.").

That suspicion was further heightened by Tuggle's next move—traveling ten to fifteen feet up into the yard of the Chippewa residence, directly toward the stolen car. The district court concluded otherwise based on a clearly erroneous view of the facts presented. Specifically, the district court presumed that anybody walking in that area would be approaching the stolen car due to the lack of sidewalks on Chippewa Street. That finding is inconsistent with the only evidence provided on that subject at the hearing. Wilkinson unambiguously indicated that Tuggle proceeded into the yard toward the parked stolen car and not parallel to the street in the following colloquy:

Q     Wouldn't anybody walking down that street have to walk towards those vehicles if they were on that side of the street?

A     No, they wouldn't have to walk up into the yard.

Q     And how far into the yard did [Tuggle] go?

A     Ten or fifteen feet

Q     How close was that to the [stolen] car?

A     About fifteen feet. The cars were about thirty feet from the roadway.

From this observation alone, the officers reasonably could have inferred that Tuggle was the Chippewa resident's boyfriend—the boyfriend suspected in the auto-theft ring and of whom the officers had no physical description.

Consequently, we disagree with the district court's analysis and conclude that the totality of the circumstances—(1) that the officers were conscious of the high crime characteristics of the neighborhood in question, including a shooting on that particular block; (2) that the Chippewa residence had been identified as the storage location for cars stolen from the airport; (3) that the unidentified boyfriend of the woman living at the residence was a suspect in that auto-theft operation; (4) that one of the cars parked in the yard of the Chippewa residence was confirmed stolen; (5) that Tuggle was observed leaning into the driver's side window of an idle vehicle blocking the roadway in front of the residence; (6) that said vehicle sped away, as if in flight, on the police officers' arrival; (7) that Tuggle correspondingly walked briskly away from the officers; and (8) that Tuggle proceeded ten to fifteen feet toward the stolen car in the yard—would warrant an officer of reasonable caution in his belief that criminal activity was afoot, and that the initial action taken, commanding Tuggle to return to the street for questioning, was appropriate.[3]

## B.

Our next task is to assess the reasonableness of the officers' subsequent frisk of Tuggle. On that point, the district court found "no evidence at all to indicate that the officers had a reasonable belief that they were dealing with an armed individual." We disagree. As Wilkinson testified, the officers proceeded

---

[3] Tuggle relies on United States v. Williams, 11 F. App'x 842, 843 (9th Cir. 2001) (unpublished), for the proposition that police are not entitled under the guise of Terry to stop virtually any person who happens to be in the vicinity of a crime scene. In that case, the officer stopped the defendant "purportedly because he was within a block of a shooting." Id. The officer did not have a description of the shooting suspect, other than the fact that he fled the scene on a bicycle, and the Ninth Circuit noted that the defendant was merely jogging at the time. Id. Thus, the Williams court determined that there was no reasonable suspicion for a Terry stop. Id. Tuggle's case is distinguishable. Tuggle was located directly in front of the Chippewa residence, or crime scene, not a block away; he tried to hurriedly retreat upon the officers' arrival; and, further, he walked directly up into the yard of the Chippewa residence toward the stolen vehicle that the officers were there to recover. Tuggle was not merely in the vicinity of another's wrongdoing. Rather, his actions raised suspicion that he was the one engaged in the wrongdoing. Thus, this authority is unavailing.

to the Chippewa residence to investigate an auto-theft ring that was suspected of stealing fifty to sixty vehicles from the airport. In conjunction with the totality of the other factors, the officers here could have reasonably deduced from such a large-scale operation, which successfully lifted numerous vehicles from a secure airport, that those involved were likely sophisticated and dangerous criminals. Thus, when Tuggle's conduct reasonably suggested that he might be part of that auto-theft ring, the officers were justified in fearing for their safety. Further, their fear was enhanced, rather than dispelled, by Tuggle's "very nervous" and "shak[y]" demeanor as he returned to the street for questioning. On this evidence, we conclude that a limited protective search for concealed weapons was supported by a reasonable belief that Tuggle might be armed and presently dangerous. See Michelletti, 13 F.3d at 840–41 ("An officer need not be certain that an individual is armed; the issue is whether a reasonably prudent man could believe, based on 'specific and articulable facts,' that his safety or that of others is in danger." (quoting Terry, 392 U.S. at 27) (emphasis added)).

Tuggle argues that his "mere propinquity to others independently suspected of criminal activity" does not, without more, give rise to reasonable suspicion to search his person. See United States v. Cole, 628 F.2d 897, 899 (5th Cir. 1980) (internal quotation marks omitted). We do not disagree, but note that here there were additional reasonable grounds which supported a frisk. The officers did not rely solely on Tuggle's presence in front of the Chippewa residence as the basis for the search, but also on their observations of the car fleeing when they arrived on the scene, and Tuggle similarly attempting to evade them by heading ten to fifteen feet up into the yard of the residence, toward the stolen vehicle. These circumstances, combined with Tuggle's nervous and shaky demeanor, objectively provided enough reasonable suspicion for the officers to assure their protection and conduct a patdown for weapons.

Moreover, even though each case involving the reasonableness of a Terry stop and frisk turns on its own facts, Michelletti, 13 F.3d at 844, an examination of two of our en banc cases, Rideau and Michelletti, as well as Terry itself, further bolsters our decision here since their facts establish no greater degree of suspicious behavior than we have found in Tuggle's case. In Rideau, the defendant, who the frisking officer suspected was drunk, was standing in the road at night in a high crime area. 969 F.2d at 1573. When the officer approached and asked the defendant's name, he appeared nervous and "critically, backed away." Id. at 1575. This court determined that it was not unreasonable under these circumstances for the officer to have feared that the defendant was moving back to give himself time and space to draw a weapon. Id. Accordingly, we concluded that it was not then unreasonable for the officer to pat the defendant's front pants pocket to determine whether he had a gun. Id.

Likewise, in Michelletti, the defendant who was frisked had barged out of the back door of a bar at closing time with his right hand tucked in his pants pocket and his left hand cupping a can of beer and approached the officer and a group of individuals the officer was about to question. 13 F.3d at 839–40. Even though the officer had testified during the suppression hearing that before the patdown, he had no specific reason to believe the defendant was armed, the en banc court still held that the officer's frisk was supported by a reasonable concern for danger because the circumstances surrounding the encounter—closing time at a bar, the size of the group of onlookers, and the possibility that the defendant was inebriated—signaled a need for caution. Id. at 842–43.

And finally, in Terry itself, the police officer had merely observed, during daylight hours, two individuals pacing back and forth in front of a store, peering into the window and periodically conferring. 392 U.S. at 5–6, 22–23. In light of

the officer's experience, the Supreme Court determined that it was reasonable for him to infer that the men were contemplating a daylight robbery, which would likely involve the use of weapons. Id. at 27–28. Thus, the Court held that the limited frisk for weapons, even after the men had departed the original scene, did not violate the Fourth Amendment. Id. at 28–29. Terry, Rideau, and Michelletti reveal the courts' willingness to defer to police officers' seasoned judgments and to permit them to "tak[e] reasonable steps to ensure their safety when they have legitimately detained an individual." Rideau, 969 F.2d at 1575; see also Holloway, 962 F.2d at 459 ("Factors that ordinarily constitute innocent behavior may provide a composite picture sufficient to raise reasonable suspicion in the minds of experienced officers . . . .") (footnote omitted). Because we cannot say that the articulable facts in this case are sufficiently less suspicious than those recounted above, we conclude that the patdown for weapons here did not violate the Fourth Amendment's proscription on unreasonable searches.[4]

### IV.

For the foregoing reasons, we REVERSE the district court's order suppressing the seized firearm and REMAND for further proceedings.

---

[4] The government also asserts that the officers' inference that Tuggle was conducting a street-level narcotics transaction supports their reasonable belief that Tuggle might have been armed and dangerous. See Ornelas, 517 U.S. at 700 ("[Supreme Court] cases have recognized that a police officer may draw inferences based on his own experience in deciding whether probable cause exists.") (citing as an example United States v. Ortiz, 422 U.S. 891, 897 (1975)); see also, e.g., United States v. Coleman, 969 F.2d 126, 131 n.20 (5th Cir. 1992) ("Weapons and violence are frequently associated with drug transactions, of course."); United States v. Dixon, 132 F.3d 192, 197 (5th Cir. 1997) ("This Circuit has explicitly recognized that firearms are tools of the trade of those engaged in illegal drug activities . . . ." (citations and internal quotation marks omitted)). Because we conclude that the other articulable facts and inferences legitimately justify the officers' patdown, it is unnecessary to address this assertion.