# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 19-60087

United States Court of Appeals
Fifth Circuit

**FILED**

December 23, 2019

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

> Plaintiff - Appellee

v.

JUSTIN HARRINGTON DARRELL,

> Defendant - Appellant

Appeal from the United States District Court
for the Northern District of Mississippi

Before HIGGINBOTHAM, DENNIS, and HO, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

Justin Harrington Darrell was arrested and charged with being a felon in possession of a firearm. He entered a conditional guilty plea, and now challenges the legality of the stop that precipitated his arrest. Finding no constitutional infirmity, we affirm Darrell's conviction and sentence.

**I.**

On September 3, 2017, Alcorn County Sheriff's Deputy Shane Latch and Farmington Police Department Officer Mike Billingsley drove to a home in Corinth, Mississippi.[1] They intended to serve an arrest warrant on one of the

---

[1] The record does not state at what time the officers departed for the house, but Darrell contends that all relevant events took place "during daytime." The Government appears to

home's occupants, Brandy Smith, for failing to appear in court. Deputy Latch later described the residence as "a known drug house" where multiple arrests and disturbances—including a shooting—had taken place in the past. Indeed, Latch himself had made several arrests there.

As the uniformed officers pulled up to the house in two marked squad cars, they saw a black Chevrolet Camaro parked in the driveway. "Almost instantaneously," Appellant Justin Darrell exited the Camaro and began walking toward the back of the house. Officer Billingsley called out to Darrell and instructed him to stop, but Darrell ignored the command and continued walking away from the officers, now at an increased pace. Deputy Latch later testified that if Darrell had walked an additional fifteen to twenty feet, he would have been behind the house and outside the officers' field of vision. Once out of their sight, the officers feared, Darrell might have withdrawn a concealed weapon or warned Ms. Smith of her impending apprehension—a crime under Mississippi law.[2] Officer Billingsley again ordered Darrell to stop. This time, Darrell complied and began walking back toward the officers. Officer Billingsley took a brown paper bag from Darrell and handed it to Deputy Latch. Inside was a bottle of whiskey—contraband in dry Alcorn County.

Officer Billingsley then asked Deputy Latch to watch Darrell while Billingsley approached the door and attempted to apprehend Ms. Smith. Deputy Latch asked Darrell what his name was, but Darrell declined to answer.[3] Deputy Latch then noticed two knives hooked onto Darrell's belt.

---

agree: In response to the judge's questioning at the suppression hearing, the prosecutor stated that he "d[id] not believe [the encounter with Darrell] was at night."

[2] *See* MISS. CODE ANN. § 97-9-103(b) ("[A] person 'renders criminal assistance' to another if he knowingly . . . [w]arns the other person of impending discovery or apprehension . . . .").

[3] According to Deputy Latch's testimony, Darrell initially responded, "You know who I am." When asked again, he told Latch that his driver's license was inside the house, but he still did not identify himself.

## No. 19-60087

Latch confiscated the knives and asked Darrell if he had any other weapons. Although Darrell said no, Deputy Latch patted him down to be sure. As he did so, he felt an item in Darrell's front pocket. He asked what it was, but Darrell did not answer. Latch later testified that "when [he] edged the pocket open," he "could see the butt end of [a] pistol." Latch then "pushed [Darrell] against the car and removed the weapon," which turned out to be a loaded semiautomatic pistol with its serial number obliterated. Darrell's pocket also contained a substance believed to be methamphetamine. Deputy Latch handcuffed Darrell and placed him in a squad car.

Latch estimated that the officers' entire encounter with Darrell lasted less than a minute. Only after Darrell had been handcuffed did the officers notice a man sitting in the passenger seat of the Camaro. He had not attempted to exit the vehicle or participated in any way in the confrontation. The officers asked the passenger to step outside, identified him as Donald Dunn, and arrested him on an outstanding warrant from the City of Farmington. Both men were transported to the Alcorn County Jail and held for investigation. A few days later, the Mississippi Bureau of Narcotics confirmed that Darrell was a convicted felon.[4]

In January 2018, Darrell was indicted for being a felon in possession of a firearm.[5] He filed a motion to suppress, arguing that "law enforcement did not possess adequate reasonable suspicion to stop and subsequently search him." The district court denied Darrell's motion following a hearing at which Deputy Latch was the sole witness called to testify, and Darrell entered a conditional guilty plea "reserving the right to appeal the ruling on the motion

---

[4] In May 2017, Darrell had been convicted of aggravated assault in Tennessee and sentenced to three years in state prison, most of which was suspended for time served. In addition, after his arrest in this case but before the federal indictment was issued, Darrell was convicted of methamphetamine possession in Mississippi state court and sentenced to eight years' custody.

[5] *See* 18 U.S.C. § 922(g)(1).

3

No. 19-60087

to suppress evidence." On January 7, 2019, Darrell was sentenced to three years' imprisonment and a three-year term of supervised release. This appeal followed.

## II.

### A.

When evaluating a ruling on a motion to suppress, we "review[] questions of law *de novo* and findings of fact for clear error."[6] All evidence is viewed "in the light most favorable to the party that prevailed" below—in this case, the Government.[7]

### B.

"Warrantless searches and seizures are 'per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.'"[8] The Supreme Court carved out one such exception in *Terry v. Ohio*.[9] Under *Terry*, if a law enforcement officer can point to specific, articulable facts that lead him to reasonably suspect "that criminal activity may be afoot," he may briefly detain an individual to investigate.[10] In addition, if the officer reasonably believes that the individual is "armed and presently dangerous to the officer[] or to others, [he] may conduct a limited protective search for concealed weapons"—often called a "frisk."[11]

Generally, the legality of such stops "is tested in two parts": "Courts first examine whether the officer's action was justified at its inception, and then inquire whether the officer's subsequent actions were reasonably related in

---

[6] *United States v. Valadez*, 267 F.3d 395, 397 (5th Cir. 2001) (citing *United States v. Jones*, 234 F.3d 234, 239 (5th Cir. 2000)).

[7] *Id.*

[8] *United States v. Hill*, 752 F.3d 1029, 1033 (5th Cir. 2014) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)).

[9] 392 U.S. 1 (1968).

[10] *Id.* at 30.

[11] *United States v. Rideau*, 969 F.2d 1572, 1574 (5th Cir. 1992) (en banc) (citing *Terry*, 392 U.S. at 24).

No. 19-60087

scope to the circumstances that justified the stop."[12] As Darrell challenges only "the justification of the initial seizure," not the scope of the ensuing search, we must answer only whether, under the totality of the circumstances, the officers had reasonable suspicion to stop Darrell as he approached Ms. Smith's house.[13]

The precise contours of the reasonable-suspicion standard remain "somewhat abstract."[14] Certainly, reasonable suspicion is a less demanding standard than probable cause or preponderance of the evidence, but the Supreme Court has "deliberately avoided reducing it to 'a neat set of legal rules.'"[15] Instead, it has "described reasonable suspicion simply as 'a particularized and objective basis' for suspecting the person stopped of criminal activity."[16] In short, while reasonable suspicion is not a "finely-tuned standard[],"[17] it is well established that "the Fourth Amendment requires at least a minimal level of objective justification for making" an investigatory stop.[18]

## III.

The parties agree that Darrell was "seized," for purposes of the Fourth Amendment, when he complied with Officer Billingsley's second command to

---

[12] *United States v. Brigham*, 382 F.3d 500, 506 (5th Cir. 2004) (citing *Terry*, 392 U.S. at 19–20).

[13] *See United States v. Arvizu*, 534 U.S. 266, 273 (2002).

[14] *Id.* at 274.

[15] *Id.* (quoting *Ornelas v. United States*, 517 U.S. 690, 695–96 (1996)).

[16] *Ornelas*, 517 U.S. at 696 (quoting *United States v. Cortez*, 449 U.S. 411, 417 (1981)); *see Whren v. United States*, 517 U.S. 806, 813 (1996) (quoting *Scott v. United States*, 436 U.S. 128, 138 (1978)) (An "officer [need] not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action . . . as long as the circumstances, viewed objectively, justify that action.").

[17] *Illinois v. Gates*, 462 U.S. 213, 235 (1983).

[18] *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (citing *United States v. Sokolow*, 490 U.S. 1, 7 (1989)).

stop.[19] The question is whether the officers had reasonable, articulable suspicion to stop him based on what they had observed up until that moment.[20]

The Government cites three key facts to support the stop. First, "Darrell exited his vehicle and attempted to flee the very moment officers pulled in behind him." Second, Darrell appeared to be heading toward the back of the house, where he could potentially "draw a gun or warn the occupants of the house." Finally, the location of the encounter—"a known drug house, where officers had made arrests and knew that a shooting had occurred"— put the officers on alert for dangerous or illegal activity. In short, "Darrell was told to stop . . . because he walked away from officers, attempting to leave their field of vision, as soon as officers arrived at a known drug house to make an arrest." Darrell counters that his behavior was innocent and that the officers had nothing but a "mere hunch," not reasonable suspicion of criminal activity.

## A.

The Government relies almost exclusively on the Supreme Court's opinion in *Illinois v. Wardlow*,[21] so a detailed consideration of *Wardlow* must be the starting point of our analysis. In *Wardlow*, two uniformed Chicago police officers "were driving the last car of a four car caravan converging on an area known for heavy narcotics trafficking in order to investigate drug transactions."[22] One of the officers noticed Wardlow standing next to a building

---

[19] *See Terry*, 392 U.S. at 17 ("[W]henever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person."); *see also Brendlin v. California*, 551 U.S. 249, 254 (2007) (citing *California v. Hodari D.*, 499 U.S. 621, 626 & n.2 (1991)) ("A police officer may make a seizure by a show of authority and without the use of physical force, but there is no seizure without actual submission . . . .").

[20] Darrell is correct that "anything found after" the moment he was stopped—including the liquor bottle, knives, and gun—"does not weigh in favor of reasonable suspicion because it was not obtained until after the seizure." *See Peterson v. City of Fort Worth, Tex.*, 588 F.3d 838, 845 (5th Cir. 2009).

[21] 528 U.S. 119 (2000).

[22] *Id.* at 121.

"holding an opaque bag."[23] Wardlow "looked in the direction of the officers and fled" down an alley before being cornered by the police cruiser.[24] An officer patted Wardlow down and discovered a loaded handgun.[25] Like Darrell, Wardlow filed an unsuccessful motion to suppress and was ultimately convicted of being a felon in possession of a firearm.[26]

The Supreme Court held 5–4 that the officers had reasonable, articulable suspicion that Wardlow was engaged in criminal activity. The majority relied on two salient facts to support its conclusion: (1) the stop took place in a high-crime area, and (2) Wardlow took off in an "unprovoked flight" as soon as he saw the approaching police cars.[27] The majority acknowledged that "[a]n individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime."[28] Neither, however, is an officer "required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation."[29] Likewise, although flight from officers "is not necessarily indicative of wrongdoing, . . . it is certainly suggestive of such" and is properly accorded substantial weight in the *Terry* analysis.[30] The Court held that, in combination, these two factors supported the officers' "determination of reasonable suspicion . . . based on commonsense judgments and inferences about human behavior."[31]

---

[23] *Id.*

[24] *Id.* at 122.

[25] *Id.*

[26] *Id.*

[27] *Id.* at 124.

[28] *Id.* at 124 (citing *Brown v. Texas*, 443 U.S. 47, 49 (1979)); *see also Gonzalez v. Huerta*, 826 F.3d 854, 857 (5th Cir. 2016) ("[T]he basic scenario of a reportedly suspicious person in an area where criminal activity had occurred in the past . . . does not support the conclusion that a particular individual is engaged in criminal conduct.").

[29] 528 U.S. at 124.

[30] *Id.*

[31] *Id.* at 125 (citing *Cortez*, 449 U.S. at 418).

The Court was careful to distinguish *Wardlow* from earlier cases in which it had recognized that "refusal to cooperate, without more," does not create reasonable suspicion.[32] While an "individual has a right to ignore the police and go about his business," the *Wardlow* Court explained,

> [f]light, by its very nature, is not "going about one's business"; in fact, it is just the opposite. Allowing officers confronted with such flight to stop the fugitive and investigate further is quite consistent with the individual's right to go about his business or to stay put and remain silent in the face of police questioning.[33]

The four *Wardlow* dissenters had no quarrel with the majority's legal framework; indeed, they commended the majority for refusing to adopt a "bright-line rule" either categorically authorizing or prohibiting *Terry* stops based on flight from police.[34] In this particular case, however, they were not persuaded by "the brief testimony of the officer who seized" Wardlow.[35] In the dissenters' view, the officer's testimony left too many relevant questions unanswered. For instance, were the vehicles in the police caravan marked or unmarked? Was there anyone else on the street near Wardlow? Was it clear that Wardlow actually saw the police approaching before he ran?[36] Without these facts, the dissenters could not be sure that the officers' suspicion was sufficient to justify the stop.[37]

The Government is correct that Darrell's case shares several salient factual similarities with *Wardlow*. Just like Wardlow, Darrell responded to the

---

[32] *Id.* (quoting *Florida v. Bostick*, 501 U.S. 429, 437 (1991)); *see also Florida v. Royer*, 460 U.S. 491, 497–98 (1983) (noting that where an officer approaches and questions an individual without reasonable suspicion, "[t]he person approached . . . need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way").

[33] 528 U.S. at 125.

[34] *Id.* at 126 (Stevens, J., concurring in part and dissenting in part); *see id.* at 136 ("[T]he Court is surely correct in refusing to embrace either *per se* rule. The totality of the circumstances, as always, must dictate the result.").

[35] *Id.* at 127.

[36] *See id.* at 137–38.

[37] *Id.* at 140.

arrival of police by making a sudden attempt to get out of the officers' sight, and in both cases the stops took place in "area[s] of expected criminal activity."[38] In fact, at least one of the two officers in this case had personally responded to prior reports of drug and gun crimes at Brandy Smith's address.[39] Moreover, the ambiguities that unsettled the *Wardlow* dissenters are not present here. We know that both police vehicles were marked, both officers were in uniform, and there was no one else present outside the house. More importantly, Deputy Latch's testimony provides compelling evidence that Darrell exited his vehicle in response to the officers' arrival. On direct examination, Deputy Latch testified that Darrell got out of the car "just a couple of seconds" after the officers arrived and immediately "started down the side of the house trying to get out of sight." On cross, Latch explained where Darrell's Camaro was parked with reference to Google Maps photos of the premises. Together, the testimony and photos indicate that Darrell would have had a clear view of the driveway in his rear-view mirror as the officers approached, and no party has identified any other event that might have prompted Darrell's exit.

Still, *Wardlow* is not as exact a match as the Government contends. In *Wardlow*, the suspect broke into "unprovoked flight upon noticing the police,"

---

[38] *Id.* at 124 (Rehnquist, C.J.).

[39] Darrell suggests, without expressly arguing, that there is not enough evidence to characterize Smith's residence as a high-crime area. However, we have recognized that "[v]isiting a house linked to drug activity is similar to being in a high-crime area." *United States v. Spears*, 636 F. App'x 893, 899 (5th Cir. 2016) (unpublished). Moreover, this Court routinely credits officer testimony that a neighborhood or home has a reputation for criminal activity, especially when the officer has personally responded to calls there in the past. *See, e.g., United States v. Tuggle*, 284 F. App'x 218, 224 (5th Cir. 2008) (unpublished) (per curiam) (accepting an officer's testimony "that he was familiar with the criminality of the area, . . . had examined police reports detailing recent criminal activity in the area[,] . . . had made prior arrests for narcotics activities [nearby] and . . . was aware of a shooting on the block"); *United States v. Miles*, 275 F.3d 1078, 2001 WL 1465241, at *1 (5th Cir. 2001) (unpublished) (per curiam) ("Officer Burge knew this address to be a 'drug house', and it was located in an area known for narcotics trafficking and violent crime.").

running down an alley until he was cornered by officers.[40] In this case, Darrell *walked* away from the police and never left their field of vision. It is true that Darrell increased his pace after Officer Billingsley first ordered him to stop. However, he never tried to run: "He just started walking faster until he was told the second time," at which point he complied and came to a stop. Certainly, the Government is correct that "flight . . . is the consummate act of evasion"[41]— but we doubt Darrell's behavior can fairly be described as "flight."

The case law on flight is not clear-cut. In *United States v. Tuggle*, we stated that a "defendant does not have to *run* away for his behavior to be considered unprovoked flight."[42] However, we focused not on the subject's "brisk walk" away from police but on other contextual factors supporting an inference of flight. We particularly concentrated on the fact that a driver who had just been conversing with the subject in an apparent drug transaction "sped off" when the police approached.[43] Similarly in *United States v. Lawson*, the subject "began to act nervous and quickly started walking away" when an officer approached him.[44] As the officer drew nearer, however, the subject "began running through busy streets in order to avoid" him.[45] The Court characterized this behavior as unprovoked flight "approach[ing] that [seen] in *Illinois v. Wardlow*."[46] Unfortunately, the opinion did not make clear precisely *when* the subject's behavior became suspiciously evasive; we are left to speculate whether the stop would have been upheld had the subject never broken into a run but instead continued walking quickly.

---

[40] *Wardlow*, 528 U.S. at 124.

[41] *Id.*

[42] 284 F. App'x at 225 (citing *United States v. Gordon*, 231 F.3d 750, 757 (11th Cir. 2000)).

[43] *Id.*

[44] 233 F. App'x 367, 370 (5th Cir. 2007) (unpublished) (per curiam).

[45] *Id.*

[46] *Id.*

We have also recognized that retreat may be a tactical strategy for an armed suspect who wishes to harm the police. In *United States v. Sanders*, an officer responded to a convenience store owner's report of "a suspicious person with a gun on the premises."[47] Upon arrival, the officer saw a man who matched the suspect's description and wore a long jacket that concealed his waistband.[48] As the man "saw the squad car pulling up, he turned and started to walk away."[49] This, together with several other contextual factors, justified the officer's decision to immediately draw his weapon and confront the man. The Court noted that walking away "can be used by a criminal to prepare for a violent confrontation by surreptitiously retrieving a concealed weapon then spinning back around to face the officer and use the weapon against him."[50]

No doubt, this is the kind of tactic Deputy Latch feared when he saw Darrell "start[ing] down the side of the house trying to get out of sight." Given our thin and highly fact-dependent precedent on flight, however, we hesitate to affirm the stop on the basis of *Wardlow* alone without also considering the cases cited by Darrell.

**B.**

Darrell relies extensively on two of this Court's recent Fourth Amendment cases: *United States v. Hill*[51] and *United States v. Monsivais*.[52] In *Hill*, the defendant was sitting in his car with his girlfriend outside her apartment complex when a "multi-car convoy of police" approached.[53] The police had not been called to the location; instead, they were conducting a "rolling patrol" in response to a county-wide increase in crime.[54] This particular

---

[47] 994 F.2d 200, 201 (5th Cir. 1993).
[48] *Id.* at 202.
[49] *Id.* at 207.
[50] *Id.*
[51] 752 F.3d 1029 (5th Cir. 2014).
[52] 848 F.3d 353 (5th Cir. 2017).
[53] 752 F.3d at 1030.
[54] *Id.* at 1031.

apartment complex was believed to be a "hotspot" for criminal activity.[55] Two officers parked their patrol car a few spots away from Hill's vehicle.[56] Hill's girlfriend then got out of the car and walked briskly toward the nearby apartment building.[57] While one officer approached the woman and began questioning her, the other knocked on the driver's side window of the car and asked Hill: "Where's your gun?"[58] Hill said he did not have one. The officer then asked for his license, and Hill again responded that he did not have one.[59] The officer told him to get out of the car, motioned for him to turn around, and frisked him—discovering a gun in the process.[60] Hill was charged with being a felon in possession of a firearm.[61]

On appeal from the district court's denial of Hill's motion to suppress, we held that the officer lacked reasonable suspicion to conduct a *Terry* stop.[62] After all, the police were not responding to a call, Hill was not violating any traffic ordinances, and Hill himself made no attempt to evade the officers.[63] As the Government points out, the question in *Hill* "was not whether officers had reasonable suspicion to seize Hill's passenger, who [at least arguably] attempted to flee when officers arrived, but whether the officers had reasonable suspicion to seize Hill, who sat peacefully in the vehicle after the officers arrived." Citing *Wardlow*, the *Hill* Court explained:

> Hill's girlfriend's movements, described by the officers as "quick," did not add up to a reasonable suspicion that Hill was engaged in criminal activity. . . . [The officers] lacked a reasonable basis to infer much of anything about the girlfriend exiting the car and taking a few steps towards the apartment during the same time as

---

[55] *Id.*
[56] *Id.* at 1032.
[57] *Id.*
[58] *Id.*
[59] *Id.*
[60] *Id.*
[61] *Id.*
[62] *Id.* at 1034.
[63] *Id.* at 1034–35.

their arrival. . . . Moreover, the question presented is not whether the officers had reasonable suspicion to seize the girlfriend, . . . but rather whether the officers pointed to specific, articulable facts that cast reasonable suspicion on Hill, who stayed seated in his car and made no suspicious movements.[64]

Given that Hill himself did not retreat from police, his case has little to tell us about the legal significance of Darrell's movements.[65] As the Government points out, Darrell is more analogous to the girlfriend than the defendant in *Hill*, while Darrell's passenger is analogous to Hill himself: "Here, Darrell was involved in the suspicious behavior, while his passenger . . . just sat in the car."

The second case on which Darrell relies, *United States v. Monsivais*,[66] also differs from his own in several critical respects. There, two patrolling officers "saw Monsivais walking east on the opposite side of the Interstate away from an apparently disabled truck."[67] When they pulled over "to offer him roadside assistance," Monsivais "did not stop but continued walking past the squad car."[68] The officers got out of their car and began asking Monsivais questions, to which he responded "polite[ly]" but with apparent nervousness.[69] Monsivais "repeatedly put his hands in his pockets, but took them out" upon request.[70] After approximately four minutes of this walking-and-talking exchange, one of the officers, Deputy Baker, stopped Monsivais and said he was going to pat him down.[71] Monsivais, a Mexican citizen without legal status in the United States, admitted to having a gun in his waistband and was

---

[64] *Id.* at 1037 (internal citations omitted).

[65] *See id.* at 1038 (Although "the girlfriend's quick movements might reflect to some extent on Hill too, since she just exited the car in which they both sat, . . . the persuasive value of her movements vis-á-vis reasonable suspicion of him is relatively diminished.").

[66] 848 F.3d 353 (5th Cir. 2017).

[67] *Id.* at 356.

[68] *Id.*

[69] *Id.*

[70] *Id.*

[71] *Id.*

ultimately charged with possessing a firearm while being unlawfully present in the country.[72]

On appeal from the district court's denial of his motion to suppress, we held that the officers lacked reasonable suspicion to stop and frisk Monsivais.[73] We noted that Deputy Baker had testified that at *no* point in the encounter did he suspect Monsivais of any criminal act. Rather, Baker decided to pat Monsivais down because he was "just acting suspicious."[74] Baker even admitted that he generally would not pursue "a stranded motorist who ran away from him and his car's flashing lights," and he offered no explanation for his decision to follow Monsivais on this occasion.[75] The Court rejected the Government's argument that "Monsivais's jittery demeanor and habit during questioning of putting his hands in his pockets" contributed to Deputy Baker's reasonable suspicion.[76] It is true, we acknowledged, that "nervous, *evasive* behavior is a pertinent factor in determining reasonable suspicion."[77] However, there was nothing evasive about Monsivais's behavior, and his nervousness was an "entirely natural reaction to police presence."[78]

As for Monsivais's choice to continue walking past the officers' car, we emphasized that "[t]he context in which a person seeks to avoid contact with a peace officer is important."[79] Although "[r]easonable suspicion may arise when an individual flees from police," such cases "involve discernable facts or combination of facts specifically linking the fleeing individual to reasonably

---

[72] *Id.* Like Darrell, Monsivais also had methamphetamine in his pocket but was not charged with a drug offense.

[73] *Id.* at 356–57.

[74] *Id.* at 358.

[75] *Id.*

[76] *Id.* at 358–59.

[77] *Id.* at 359 (quoting *Wardlow*, 528 U.S. at 124).

[78] *Id.* (quoting *United States v. McKoy*, 428 F.3d 38, 40 (1st Cir. 2005)).

[79] *Id.* at 360.

suspected criminality—e.g., flight *in a high-crime area* or flight *after receipt of a tip indicating criminality.*"[80]

*Hill* and *Monsivais* do not offer Darrell the support he claims they do. In fact, under the terms of *Monsivais*, Darrell's behavior is a prototypical case of suspicious activity: flight from police in a high-crime area. The *Monsivais* language, together with *Wardlow*'s reliance on these same two factors, plainly contradicts Darrell's claim that his presence in a "high crime area and evasive behavior" are insufficient "to support a finding of reasonable suspicion." Moreover, as Deputy Latch testified, the officers reasonably feared that Darrell might draw a weapon or warn the target of their arrest warrant if he were permitted to withdraw from view. Finally, the fact that Darrell "was not seen committing any criminal activity" does not detract from the reasonableness of the officers' suspicion. *Terry* requires "reasonable suspicion supported by articulable facts that criminal activity 'may be afoot'"; it does not require certainty that a crime is in fact being committed.[81] Viewing this case under the totality of the circumstances, we hold that reasonable suspicion supported the brief investigatory stop of Darrell.

## IV.

For the foregoing reasons, Appellant's conviction and sentence are affirmed.

---

[80] *Id.* at 360–61.

[81] *Sokolow*, 490 U.S. at 7 (quoting *Terry*, 392 U.S. at 30).

No. 19-60087

JAMES L. DENNIS, Circuit Judge, dissenting.

This Fourth Amendment case centers on whether police had the reasonable suspicion required to conduct an investigatory seizure of the defendant under *Terry v. Ohio*, 392 U.S. 1 (1968). The majority affirms the district court's denial of the defendant's motion to suppress. I respectfully disagree that reasonable suspicion under *Terry* existed here.

In order to seize a person for investigation, the officer must be able to point to specific and articulable facts that lead him to reasonably suspect that a particular person is committing, or about to commit, a crime. *United States v. Hill*, 752 F.3d 1029, 1033 (5th Cir. 2014). The officer must be able to articulate more than an "'inchoate and unparticularized suspicion or hunch' of criminal activity." *Illinois v. Wardlow*, 528 U.S. 119, 123–124 (2000) (quoting *Terry*, 392 U.S. at 27). The government has the burden of proving "the specific and articulable facts that support the reasonableness of the suspicion." *See id.* Here, the government fails to satisfy that requirement.

## I.

On September 3, 2017, two police officers pulled their police cruisers into the driveway of a home in Corinth, Mississippi to execute an arrest warrant on one of the residents of the home for failing to appear in court. In doing so, the officers blocked in a black Chevrolet Camaro that was occupied by its owner, defendant Justin Darrell, and another person. The police officers were aware that the location was "a known drug house" where past disturbances had occurred and arrests had been made.

Darrell exited the driver's seat of the Camaro and began walking toward the carport-adjacent left side of the house. One of the officers ordered Darrell to stop, but Darrell did not comply and instead slightly increased the pace of his walk. The officer ordered Darrell to stop a second time, and this time Darrell obeyed, turning and walking back to the officers. When Darrell drew

close, one of the officers noticed two sheathed knives on Darrell's belt and proceeded to pat Darrell down. He discovered a gun in Darrell's pocket, and, based on this weapon, Darrel was later indicted for being a felon in possession of a firearm in violation of 18 U.S.C. 922(g)(1).

Prior to trial, Darrell moved to suppress the firearm found on his person, arguing the officers violated the Fourth Amendment when they seized him because they did not have reasonable suspicion that he was engaged in criminal activity. At a hearing on the motion, the Government argued that reasonable suspicion existed because the officers feared Darrell would either retrieve a weapon or warn the target of the arrest warrant. The district court proceeded to find that reasonable suspicion existed, citing the setting of the stop at a known drug house, Darrell's exit and walk toward the side of the house upon the police's arrival, and Darrell's increase in walking pace after the initial order to stop. The court therefore denied Darrell's motion to suppress. Darrell entered a conditional guilty plea that reserved his right to appeal the court's ruling, and this appeal followed.

## II.

The parties agree that Darrell was seized when he complied with the officer's second order to stop, and that this initial seizure did not rise to the level of a full arrest requiring probable cause. Relying primarily on *Illinois v. Wardlow*, 528 U.S. 119 (2000), the majority holds that reasonable suspicion existed for an investigatory seizure under *Terry v. Ohio,* 392 U.S. 1 (1968), due to Darrel's walking away from the officers while being present in the driveway of a known drug house. I disagree with the majority's conclusion that *Wardlow* applies here. Darrel exited a car and walked away from it, leaving his vehicle and a passenger in the driveway. Characterizing this as unprovoked flight is essentially speculation—the kind of "inchoate and unparticularized suspicion or 'hunch,'" that is not a reasonable basis for suspicion under *Terry*. 392 U.S.

at 27. The police had no "specific and articulable" basis for suspecting Darrell of criminal activity, *id.* at 21, because his actions were at least equally consistent with an innocent "continuation of previously-undertaken actions" as they were with flight from the police. *Alexander v. City of Round Rock*, 854 F.3d 298, 304 (5th Cir. 2017). Such conduct "does not create reasonable suspicion" under our precedents. *Id.*

The majority is correct that in *Wardlow*, the Supreme Court held that, where a suspect was present in an area known for heavy narcotics trafficking and carrying an opaque bag, his unprovoked, "head-long" flight from police was a reasonable basis for suspicion to justify a *Terry* stop. 528 U.S. at 124. As the majority relates, however, the Court was careful to distinguish earlier cases in which it had held that "an individual has a right to ignore the police and go about his business" without creating reasonable suspicion. *Id.* at 125 (citing *Florida v. Royer*, 460 U.S. 491 (1983); *Florida v. Bostick*, 501 U.S. 429, 437 (1991)). "Flight is not 'going about one's business';" the Court emphasized. *Id.* "[I]n fact, it is just the opposite." *Id.*

This court examined this distinction in *United States v. Hill*, 752 F.3d 1029 (5th Cir. 2014), which the majority finds inapposite. In *Hill*, officers on a roaming patrol parked next to a vehicle containing the defendant Hill and his girlfriend at an apartment complex that the officers later testified was a "hotspot" for criminal activity. 752 F.3d at 1031-32. Hill and his girlfriend noticed the police's arrival and the girlfriend proceeded to exit the car and quickly walk toward the apartment complex. *Id.* at 1032. While one officer approached the girlfriend, the other ordered Hill out of the car, saw a gun butt protruding from Hill's pocket, and arrested him. *Id.* In considering whether the girlfriend's swift exit and walk toward the apartment created reasonable suspicion that Hill was engaged in criminal activity, this court stated,

Of critical importance is that only a matter of seconds passed between [the officers'] first seeing Hill and the girlfriend in the car and the officers' stopping and observing the girlfriend step out of the car and take a few steps towards the apartment. Considering that the officers had no particular reason to suspect criminal activity at the apartment complex at the time they arrived (that is, there was no tip or other particularized cause for believing that anything was afoot), there is little basis to infer anything from the fact that the girlfriend exited the car at the same time the police arrived on the scene. Of course, she could have exited the car out of a desire to flee from the police; or, she could have simply exited the car because Hill drove her home, they finished saying their "goodbyes," and she was preparing to go inside. The point is, because the officers did not observe the scene for more than a few seconds and they had no other reasons to reasonably suspect criminal activity, such as a tip, they lacked a reasonable basis to infer much of anything about the girlfriend exiting the car and taking a few steps towards the apartment during the same time as their arrival.

*Id.* at 1037 (citation omitted).

The majority argues that *Hill* "has little to tell us about the legal significance of Darrell's movements" because ultimately the court was analyzing whether the girlfriend's actions created reasonable suspicion that the defendant Hill was involved in criminal activity. Because Darrell is more analogous to the girlfriend who exited the car than to Hill who remained in the car, the majority considers *Hill* nonapplicable. But this court later incorporated *Hill*'s analysis of whether the officer could reasonably suspect *the girlfriend* of criminal activity into the holding of *Alexander v. City of Round Rock*. 854 F.3d at 304. *Alexander* was a § 1983 case alleging a Fourth Amendment violation based on an officer's seizure of an individual in a high crime area who got in his car and began to drive away upon seeing a police

cruiser. *Id.* In summarizing *Hill's* reasoning, the court expressly held that "circumstances that could equally be interpreted as flight from officers or as continuation of previously-undertaken actions do not create reasonable suspicion." *Id.*

In light of this subsequent holding, the parallels between *Hill* and the present case become much more compelling. As in *Hill*, Darrell was sitting in a car in an area that police testified was known for criminal activity, but police "had no particular reason to suspect criminal activity at the [house] at the time they arrived (that is, there was no tip or other particularized cause for believing that anything was afoot)." *Hill*, 752 F.3d at 1031, 1037. And as in *Hill*, Darrell exited his vehicle almost immediately upon the officers' arrival and proceeded to walk toward the dwelling. Darrell "*could* have exited the car out of a desire to flee the police; or, [he] could have simply exited the car because" he had arrived at his destination or realized he had forgotten something.[1] *Id*. at 1037. Indeed, the record is not even totally clear that Darrell saw the police arrive. The officers "lacked a reasonable basis to infer much of anything about [Darrell] exiting the car and taking a few steps towards the [house] during the same time as their arrival." *Id.* In short, Darrell's actions could at least be "equally . . . interpreted as flight from officers or as continuation of previously-undertaken actions," and this court has held that such circumstances "do not create reasonable suspicion." *Alexander*, 854 F.3d at 304.

---

[1] That Darrell appeared to be on a path to use an entrance other than the front door is reasonable given the setting; the home appears to be located on a large plot of land in a rural area, and residents may enter homes from a carport or rear door in these environments. Moreover, Darrell could have been in the process of retrieving something from the back yard or any number of other activities elsewhere on the property. The officers "lacked a reasonable basis to infer much of anything about [Darrell] exiting the car and taking a few steps" in *any* direction. *Hill*, 752 F.3d at 1037.

No. 19-60087

Considering the above analysis, I believe it is apparent that, had Darrell complied with the officers' first order to halt, he would have been subjected to an illegal seizure because no reasonable suspicion existed at that point in time. What remains of the facts relied on by the Government are essentially Darrell's non-compliance with this initial attempted unlawful seizure and his subsequent increase of walking pace.[2] However, it is difficult to square the notion that this non-compliance may give rise to reasonable suspicion with *Wardlow*'s unequivocal reaffirmation that "any 'refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a

---

[2] The Government argues that this seizure was justified under *Terry* in part because the officers needed to secure Darrell to prevent him from retrieving a weapon or warning the target of the arrest warrant of the police's presence. However, the purpose of a *Terry* stop is inherently investigatory, and, absent reasonable suspicion, *Terry* does not permit an officer to seize a person for the practical, non-investigative purpose of preventing the individual from interfering with the execution of a warrant. *See Terry v. Ohio*, 392 U.S. 1, 22 (1968) ("[A] police officer may in appropriate circumstances and in an appropriate manner approach a person *for purposes of investigating possibly criminal behavior* even though there is no probable cause to make an arrest." (emphasis added)). An initial *Terry* stop is justified only when the officer has reasonable suspicion that an individual is committing or will imminently commit a crime. *Arizona v. Johnson*, 555 U.S. 323, 326 (2009). Here, while it would certainly have been a crime for Darrell to retrieve a weapon and harm the officers or to warn the target of the warrant in order to help her evade arrest, the government has not pointed to any specific and articulable facts that support a reasonable suspicion that Darrell would have engaged in these crimes.

The government emphasizes that this was a split-second decision based on the need to ensure officer safety and the integrity of the law enforcement operation. But the Supreme Court has addressed Fourth Amendment concerns regarding the need to seize individuals without reasonable suspicion for these purposes through a separate exception to the warrant requirement In *Michigan v. Summers*, the Court held that a search warrant for contraband carries with it the authority to detain individuals on the premises of the targeted dwelling while the warrant is executed irrespective of whether there is any reason to believe they are involved in criminal activity. 452 U.S. 692, 702–03 (1981). The motivations for this rule include the need to protect the executing officers from harm and to prevent the spoliation of evidence. *Id.* Neither the Supreme Court nor this circuit has extended *Summers* to cover the execution of an *arrest* warrant, however, and the Government has not raised *Summers* or its progeny as support for its authority to detain Darrell. The Government's contentions regarding the practical necessity of detaining Darrell are therefore irrelevant to our analysis. And, while we do not consider officers' subjective intentions in determining the reasonableness of a *Terry* seizure, *see Whren v. United States*, 517 U.S. 806, 813 (1996), the government's arguments on this point notably suggest that any claim that the officers had grounds to suspect Darrell of such criminal activity is a *post hoc* rationalization.

21

detention or seizure.'" 528 U.S. at 125 (quoting *Bostick*, 501 U.S. at 437); s*ee also id.* ("[W]hen an officer, without reasonable suspicion or probable cause, approaches an individual, the individual has a right to ignore the police and go about his business." (citing *Royer*, 460 U.S. at 498)).

Accordingly, I would hold that the totality of the circumstances indicates the officers did not have reasonable suspicion under *Terry* that Darrell was engaged in criminal activity.

***

As set out above, I respectfully disagree with the majority's conclusion that the officers in this case had specific and articulable grounds to suspect Darrell of criminal activity. Darrell's walking away was not the unprovoked, head-long flight that the Supreme Court found reasonably suspicious in *Wardlow*, and I fear today's decision ventures down a slippery slope that erodes individuals' constitutional right to go about their lives free from arbitrary police interference. I would therefore hold that the district court erred by denying Darrell's motion to suppress because *Terry* does not justify the seizure at issue in this case.