REVISED

# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

November 16, 2020

Lyle W. Cayce
Clerk

No. 19-50801

United States of America,

*Plaintiff—Appellee*,

*versus*

Raymond McKinney, *also known as* Ray Lee McKinney, *also known as* Ray L. McKinney, *also known as* Raymond L. McKinney, *also known as* Scott Eaven, *also known as* Scott Lee, *also known as* Raymond Lee McKinney, *also known as* Ray Green,

*Defendant—Appellant*.

Appeal from the United States District Court
for the Western District of Texas
USDC No. 5:18-CR-131

Before Owen, *Chief Judge*, and Davis and Southwick, *Circuit Judges*.
Leslie H. Southwick, *Circuit Judge*:

Raymond McKinney entered a conditional guilty plea to the charge of being a felon in possession of a firearm. He reserved the right to challenge on appeal the denial of his motion to suppress evidence of the discovery of the firearm by an officer patting him down prior to questioning. McKinney was detained for questioning while standing on a sidewalk with others near a business that in recent days had been the location of multiple gang-related

shootings.  We conclude that the evidence before the district court did not support that officers had reasonable suspicion to detain McKinney for questioning.  We REVERSE the judgment of conviction and the sentence, which were based on the conditional guilty plea, and REMAND for further proceedings.


FACTUAL AND PROCEDURAL BACKGROUND

In mid-September 2017, at about 9:00 p.m., McKinney and three other individuals were on a sidewalk near a gas station in San Antonio, Texas. That station had in recent days been the location of drive-by shootings, one as recent as 4:00 a.m. that day.  Two officers approached, frisked the three men in the group, and discovered a gun on McKinney.  He was charged with being a felon in possession of a firearm.  *See* 18 U.S.C. § 922(g)(1).

In a motion to suppress evidence of the gun, McKinney argued that the officers lacked reasonable suspicion both for the initial stop and for the later frisk.  McKinney used the officers' body-camera videos and the police report as his supporting evidence.  The Government filed a response in opposition, attaching still shots of the video as well as news articles reporting the recent shootings in the area.  Without holding a hearing, the district court denied the motion in summary fashion.  It later issued a second order explaining its reasoning for the denial.

Without an evidentiary hearing, we do not have the benefit of testimony from the officers.  Neither party submitted any affidavits. Instead, the body-camera videos, videos from the police SUV cameras, and the police report constitute the evidence.

Around ten o'clock on the night of the arrest, San Antonio officers Holland and Carmona were on patrol in an unmarked police SUV near the gas station that had been the location of recent drive-by shootings.  The

officers turned out of the gas station and, within seconds, pulled up to McKinney and three others standing on the sidewalk.  The group consisted of McKinney, two men, and a woman.  Officer Holland jumped out of the passenger seat and said, "What's up gentlemen? What's going on today?"  As he approached the group, he shined his light on the woman, who appeared to be slowly walking away from the group, then ordered her to come back.  She complied.  Officer Holland immediately frisked the two other men.

At this point, Officer Carmona exited the SUV and focused his attention on McKinney, who was standing with his illuminated phone in one hand, a bottle of Minute Maid in the other, and a backpack on his back.  Officer Carmona asked if he lived nearby, and McKinney responded, "No, Sir."  Officer Carmona asked if he had any guns on him, and McKinney said that he did not.  Officer Carmona asked to "pat [McKinney] down real quick [to make sure he did not have] any guns."  McKinney declined to consent to a search.  Officer Carmona said that he was not "searching" him, just "patting [him] down."  By now, Officer Carmona was holding McKinney.  He patted McKinney down and found a gun in his waistband.  McKinney was then handcuffed.

In the minutes that followed, the officers made several statements explaining their reasons for initiating the investigatory detention and conducting the pat-downs. When McKinney asked why he was "searched," Officer Holland responded that it was because McKinney was "out here with a gun," near "a place that [was] shot up the other day," and that he was "hanging out over here in a jacket in the middle of the summer."  Officer Carmona later told McKinney he was frisked because he was in an area known for shootings even though he did not live there.  Officer Carmona added: "You want to know what my reasonable suspicion is?  That there's been three or four shootings here in the last day and a half."  Later, Officer Holland warned the others in the group: "[If] [y]ou are hanging out over

here, you are going to get stopped, you are going to get checked. Especially if you are gang members."

Two of the Government's arguments are that the clothing worn by McKinney and others supports a reasonable suspicion of criminal gang activity. The body-camera videos show that McKinney was wearing a black Nike windbreaker, a black bucket hat accented with the colors of the Jamaican flag, and red shorts. He also had a light-colored backpack. The woman wore a pink shirt with a pink bow in her hair.[1] One of the men wore a white shirt, white hat, and khaki pants. The other wore a white shirt and dark pants, but it is unclear whether the pants were red or another color.

The police report, created by Officer Holland, states that the officers observed "gang members hanging out" near the gas station. It asserts that "[t]he group was wearing red colors," though in fact only McKinney had red clothing, and that McKinney was wearing a jacket and hat even though "[i]t was quite warm and humid out." The report also states that when one of the men saw the officers, he "turned and appeared to drop something very small." Finally, it claims that the officers approached the group and frisked the men "due to the area being a [B]loods gang location and all of [the] [recent] shooting[s] at this location."

McKinney moved to suppress the evidence of the firearm. The district court entered a summary denial in September 2018. In April 2019, the court entered a second, detailed order on the motion. The court held that the officers' actions were justified. To conclude there was reasonable

---

[1] The district court incorrectly found that the woman was wearing a "big red sparkly bow," which it concluded was "more evidence of the red gang color." Whether the fact the color was pink, not red, would have been clear to the officers that night is unknown on this record. The Government also did not offer evidence that pink clothing would have been worn as a close substitute for red in order to reflect gang affiliation.

suspicion for the stop, the court relied on the following: (1) recent gang violence in the area; (2) the red, gang-related clothing; (3) McKinney's wearing a jacket and backpack on a hot summer night; (4) the woman's exhibiting evasive behavior by trying to "distance herself"; and (5) Officer Holland's observation that "one of the individuals drop[ped] something very small" in a "quick hand motion indicative of someone getting rid of evidence, usually narcotics." The court "infer[red]" that the officers were "seasoned" and "trained."

The district court also concluded that the officers had reasonable suspicion to frisk McKinney, *i.e.*, that he was armed and dangerous. For support, the court pointed out, again, his wearing a jacket and backpack on a hot night. The court also noted that the red shorts were a "gang color." The court also contended that McKinney's refusal to consent to a pat-down supported reasonable suspicion to do so without consent. Additionally, the court found that the ultimate discovery of the gun possessed by someone wearing gang colors supported a reasonable suspicion to conduct the frisk.

Based on these findings, the district court denied the motion to suppress. McKinney entered a conditional guilty plea but reserved the right to challenge the denial of his motion to suppress. This appeal followed.

## DISCUSSION

Warrantless searches and seizures are presumptively unreasonable, subject to certain exceptions. *United States v. Hill*, 752 F.3d 1029, 1033 (5th Cir. 2014). One exception provides that "officers may briefly detain individuals on the street, even though there is no probable cause to arrest them, if they have a reasonable suspicion that criminal activity is afoot." *United States v. Michelletti*, 13 F.3d 838, 840 (5th Cir. 1994) (*en banc*) (discussing *Terry v. Ohio*, 392 U.S. 1 (1968)). Similarly, reasonable,

individualized suspicion that someone being stopped for brief questioning is armed and dangerous must exist before the officer may conduct a pat-down. *Maryland v. Buie*, 494 U.S. 325, 334 n.2 (1990).

A seizure must be "justified at its inception." *Hiibel v. Sixth Jud. Dist. Ct.*, 542 U.S. 177, 185 (2004). Reasonable suspicion must exist *before* the initiation of an investigatory detention. *United States v. Monsivais*, 848 F.3d 353, 359 (5th Cir. 2017). Reasonable suspicion exists if the officer can "point to specific and articulable facts that lead him to reasonably suspect that a particular person is committing, or is about to commit, a crime." *Hill*, 752 F.3d at 1033. It cannot be unparticularized or founded on a mere hunch. *United States v. Jaquez*, 421 F.3d 338, 341 (5th Cir. 2005). Instead, "a minimal level of objective justification" is required. *Id.* Observations capable of innocent explanation when considered alone might rise to the level of reasonable suspicion in the aggregate. *United States v. Arvizu*, 534 U.S. 266, 277–78 (2002). Likewise, an officer can have a reasonable suspicion without ruling out every innocent explanation. *Id.* at 277. We account for the totality of the circumstances in determining whether there was a "'particularized and objective basis' for suspecting legal wrongdoing." *Id.* at 273 (quoting *United States v. Cortez*, 449 U.S. 411, 417–18 (1981)).

When reviewing the denial of a motion to suppress, we review questions of law *de novo* and findings of fact for clear error. *United States v. Bolden*, 508 F.3d 204, 205 (5th Cir. 2007). For factual findings, we give the district court heightened deference when the judge had the "opportunity to judge the credibility of those witnesses," a benefit that appellate courts do not have. *See United States v. Gibbs*, 421 F.3d 352, 357 (5th Cir. 2005). There was no evidentiary hearing in this case, though, so there is no heightened deference to the district court's findings of fact.

Whether there is sufficient evidence to support reasonable suspicion is a question of law; consequently, our review is *de novo*. *Monsivais*, 848 F.3d at 357. Demonstrating reasonable suspicion is the Government's burden. *Hill*, 752 F.3d at 1033. On this issue, we view the evidence in the light most favorable to the party that prevailed in district court. *United States v. Freeman*, 914 F.3d 337, 341 (5th Cir. 2019). Here, that is the Government. We will uphold the district court's decision if there is any reasonable view of the evidence to support doing so. *Id.* at 342.

The parties do not appear to dispute when McKinney and the others were seized. "It must be recognized that whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." *Terry*, 392 U.S. at 16. When Officer Holland jumped out of the police SUV and approached the group, he shined his flashlight on the woman who appeared to be walking away and ordered that she return. No reasonable person would have felt free to walk away. As a result, each person in the group was seized at that moment.

Because the initial detention must be justified at its inception, *Monsivais*, 848 F.3d at 357, the issue in this case is whether the officers had reasonable suspicion based on their observations at the time they ordered the woman to stop. If reasonable suspicion is lacking at this point, there is no need to analyze whether the subsequent pat-down was supported by a reasonable suspicion that McKinney was armed and dangerous. *See id.* In contrast, if the initial detention is justified by a reasonable suspicion, facts supporting a pat-down can develop after the suspect has been detained. *See Pennsylvania v. Mimms*, 434 U.S. 106, 111–12 (1977) (holding *Terry* pat-down was justified when officer noticed a bulge in suspect's jacket after initiating a routine traffic stop).

No. 19-50801

To determine whether reasonable suspicion existed at the initiation of the investigatory detention, we evaluate each fact identified by the district court as supporting a reasonable suspicion to initiate the investigatory detention. Our conclusion, though, depends on the combination of facts.

## I.     *Gang violence*

The district court found that the officers were "aware of recent gang violence" in the area, *i.e.*, the drive-by shootings at the nearby gas station. The officers, according to the court, were "closely patrolling" this area in response to the shootings. On appeal, McKinney argues his presence in a high-crime area is not evidence to support reasonable suspicion.

Certainly, "the fact that the stop occurred in a 'high crime area' [is] among the relevant contextual considerations in a *Terry* analysis." *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000). Still, a person's "presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime." *Id.* The officers were patrolling the area in response to recent shootings, but those shootings do not justify stopping anyone absent an articulable suspicion about a connection between the person and those crimes. In one case, we held that an officer lacked reasonable suspicion to stop a red vehicle just fifteen minutes after receiving a dispatch that a red vehicle was involved in gun fire in the same area. *Jaquez*, 421 F.3d at 340–41. In another, we held that reasonable suspicion did exist when officers heard gunshots "around the corner," and within one minute pulled over a vehicle being driven "relatively fast" from the direction of the shooting. *United States v. Bolden*, 508 F.3d 204, 207 (5th Cir. 2007).

From the evidence introduced by the Government, this was a mixed residential and commercial area, containing a few stores and restaurants to which the local residents could walk. A small group being on a sidewalk was

not itself evidence of anything suspicious.  Later, officers learned that none of those in the group lived in the immediate area, but there was no evidence officers knew that when the stop was made.  Nothing observed by the officers connected McKinney or anyone else standing on the sidewalk to the recent and nearby shootings that had been made from passing vehicles.  The officers hardly even alleged a suspicious connection.  Officer Holland told the group that "if [y]ou are hanging out over here [near the location of the recent shootings], you are going to get stopped, you are going to get checked. Especially if you are gang members."

## II.    *Red clothing*

The district court relied on the finding that McKinney and others were wearing some red clothing.  The court characterized the clothing as evidence of gang involvement.  The police report remarked that "[t]he group was wearing red colors" and that the area was a "[B]loods gang location." According to the report, this was one principal reason for making the investigatory stop.  Our review of the videos indicates that the only person wearing red clothing was McKinney, whose shorts were red.[2]  The district court found that the woman was wearing a "big red sparkly bow," described as "more evidence of the red gang color."  Her bow, though, was pink, and matched her pink shirt.  There is no evidence that officers reasonably believed that a color somewhat close to red was also what gang members wore.

Our concern with these first two factors — high-crime area and gang colors — is that as far as the record demonstrates, this high-crime area was residential and, presumably, people other than gang members lived there.

---

[2] The Jamaican flag on McKinney's hat had a small red stripe, not reasonably suggestive of showing allegiance to this neighborhood gang.

We cannot accept that there is reasonable suspicion for questioning everyone in a crime-ridden neighborhood wearing one article of clothing that is not an unusual color but happens also to be the color of choice for a gang. Additional evidence, such as showing that police were aware that residents of the area who are not gang members avoided wearing those colors to prevent trouble with gang members or with police, would allow the clothing of only one person in a group to be considered more significant.

The Government urges us to consider one of our nonprecedential opinions which held there was reasonable suspicion in part because the suspect was "wearing gang colors." *See United States v. Miranda*, 393 F. App'x 243, 246 (5th Cir. 2010). There, though, the officer already knew the suspect because the same officer had arrested him on a prior occasion. *Id.* at 244. The reasonable suspicion was supported by the officer's knowledge that the suspect was a felon and member of a violent gang, and also the officer's observations that the suspect was wearing gang colors and trespassing in an area known for gang-related crime. *Id.* at 246.

Unlike *Miranda*, there is no evidence either officer knew McKinney or anyone in the group. We consider the red shorts at most to be a start towards suspicion but not enough. It might well have been suspicious if in fact the *group* had been wearing red, suggesting reason and not randomness to the wearing of that color. That they were in a high-crime residential area does not add to suspicion absent some evidence that it was reasonable to suspect that those willing to be outside at that location at that time of night were gang members.

The record strongly supports a finding that the comments we have already quoted from the officers were the actual and insufficient reasons for the stop. Officer Carmona said his "reasonable suspicion" was that there had been multiple shootings. Officer Holland believed it was enough to stop

people who "are hanging out over here," especially if the people are members of a gang — presumably meaning anyone wearing red. Even though the articulated reasons fail, the test to be applied is objective, meaning it does not depend on what the officers claimed as reasons. *See Jaquez*, 421 F.3d at 341. We look at the remainder of the relevant evidence to determine whether other facts known to these officers objectively justified the stop.

### III.    *McKinney's clothing and backpack*

The court relied on its finding that McKinney, unlike the others, "was wearing a jacket and had a backpack on a hot September night." The police report notes that McKinney was wearing a jacket. Our understanding from the briefing and from our review of the video is that the jacket was something like a "windbreaker," which might not be suspicious if, as McKinney claimed, it had been lightly raining earlier. The Government insists McKinney was "dressed oddly, given the warm night," in clothes that could potentially conceal a weapon. In the body-camera footage, Officer Holland explained to McKinney that he was searched because he was "out here with a gun," near a place that "just got shot up" while he was wearing "a jacket in the middle of the summer." Although the officers might have been able to see that McKinney was wearing some sort of outerwear, we cannot discern on this record whether officers could have known before approaching the group how out-of-season McKinney's jacket was.

We start with the obvious. The fact that McKinney did have a gun in his waistband is irrelevant to a determination of whether reasonable suspicion existed in order to initiate an investigatory detention. *See Florida v. J.L.*, 529 U.S. 266, 271 (2000).

As to the backpack, a panel of the court once stated that "the very common occurrence of having a backpack in a vehicle and the multitude of innocent uses for a backpack in a vehicle render[ed] the presence of a

backpack in [the suspect's] vehicle of little persuasive value." *United States v. Spears*, 636 F. App'x 893, 904 (5th Cir. 2016). We agree with that assessment. There is no indication from the body-camera videos that the officers even saw the backpack before stopping the group. In the police report, the officers mentioned the weather and McKinney's "floppy hat" but did not mention a backpack.

We consider the jacket, and how it appeared to the officers, to be the one piece of evidence that, when added to the rest of what we have discussed, might have created just enough suspicion to move beyond a mere hunch. Generally speaking, the concealing nature of a suspect's clothing may support a stop or a search. In a traffic-stop case, we held that an officer had reasonable suspicion to prolong the stop based on extreme nervousness exhibited by the driver and passengers, inconsistent answers to his questions, the inability of the driver to provide basic information, and also that the driver was wearing baggy clothing. *United States v. Henry*, 372 F.3d 714, 715–16 (5th Cir. 2004). In another case, we held that an officer acted reasonably in immediately drawing his weapon when he confronted the suspect, in part because the suspect wore a long tan jacket that could hide a weapon. *United States v. Sanders*, 994 F.2d 200, 207 (5th Cir. 1993). The officer was responding to a call that a suspicious man was on a grocery store premises in a neighborhood known for violence and weapons. *Id.* at 201.

We have much less in the present case. The officers initiated the investigatory detention before observing nervousness or hearing any statements, much less inconsistent ones. There also was no report of a just-committed offense for which individuals in the immediate area might be seen as more likely involved.

We see some similarities to the facts that caused the Eighth Circuit to hold that officers did not have reasonable suspicion to stop and frisk an

individual. That person was "wearing a long-sleeved hooded sweatshirt and clutching the front area of his hoodie pocket with his right hand." *United States v. Jones*, 606 F.3d 964, 965 (8th Cir. 2010) (quotation marks omitted). The Government argued that reasonable suspicion existed based on the suspect's: (1) holding his hand against his body, indicative of carrying a firearm; (2) walking in a high-crime neighborhood; (3) wearing a sweatshirt when it was 68 degrees and sunny, suggesting that he was "hiding something"; and (4) watching the officers in a concerned manner. *Id.* at 966. The suspect "did not panic or flee," and the officers detained him "before he said anything suspicious or incriminating." *Id.* The court held that the suspect's behavior was innocent; walking in a high-crime area in a sweatshirt and watching a police vehicle pass were not reasonably suspicious. *Id.* at 967.

Similarly, McKinney did not panic or flee; there were no suspicious statements; and there were no suspicious, concerned looks emanating from those whom the police ended up stopping.

Thus, we are back to the jacket. Could police reasonably believe it was so out-of-season in appearance, with whatever lighting existed as the stop was occurring, to be suspicious? Or did it instead appear to be a light jacket useful for nothing more than keeping off rain? The current record does not allow us to determine.

## IV.    *Evasive behavior*

The district court also relied on its finding that the woman attempted to distance herself when the officers arrived. In the body-camera video, she appears to slowly walk away from the group, but she immediately complied with the officer's order to return. Her apparently evasive behavior is not mentioned in the police report.

The Supreme Court has held officers had reasonable suspicion when, in a high-crime area, the suspect noticed the police and immediately engaged

in "unprovoked flight." *Wardlow*, 528 U.S. at 124–25. There, the suspect ran from police in a "headlong" manner." *Id.* at 122, 124. We recently allowed lesser speed to create suspicion where "flight" was a quick walk away from police. *United States v. Darrell*, 945 F.3d 929, 935, 938 (5th Cir. 2019). As officers arrived at a house to serve an arrest warrant, they noticed a car parked in the driveway. *Id.* at 930. The suspect immediately exited the vehicle and began walking toward the house, ignoring commands from officers to stop while increasing his pace. *Id.* The suspect eventually complied and walked back to the officers. *Id.* at 931. The *Darrell* court held that this constituted "flight from police in a high-crime area," which was "a prototypical case of suspicious activity." *Id.* at 938.

We have also held that a defendant's girlfriend's brisk walk from a car after noticing police did not create reasonable suspicion as to the defendant, who was still sitting in the car. *Hill*, 752 F.3d at 1031. As to the defendant, the court explained that "the girlfriend's quick movements might reflect to some extent on [the defendant] too, since she just exited the car in which they both sat, but the persuasive value of her movements vis-à-vis reasonable suspicion of him is relatively diminished." *Id.* at 1037.

Here, we do not see that the woman engaged in something equivalent to flight from the scene. The suspect in *Wardlow* ran down an alley to avoid capture. *Wardlow*, 528 U.S. at 122. In *Darrell*, the suspect walked away from the officers but also ignored initial commands to stop, thereby creating a fear in the officers that he would draw a concealed weapon. *Darrell*, 945 F.3d at 930–31. The woman here certainly did not engage in flight such as what occurred in *Wardlow*. Unlike *Darrell*, when Officer Holland ordered the woman to come back, she immediately complied. Further, there is no indication that her conduct caused the officers to fear for their safety.

Most importantly, McKinney is not the person who engaged in the arguably suspicious departure from the scene.  As we held in *Hill*, the woman's attempt to distance herself is of "relatively diminished" persuasive value as to someone else.  *Hill*, 752 F.3d at 1037.  It does not give rise to reasonable suspicion here.

Additionally, wrapped up in our reasonable-suspicion inquiry is the presence or absence of *nervous* behavior.  *See, e.g.*, *Monsivais*, 848 F.3d at 359.  Nervous behavior is indeed supportive of a reasonable suspicion.  *Wardlow*, 528 U.S. at 124.  Here, though, there is no evidence that McKinney or anyone exhibited any nervous behavior.

## V.    *Observing someone "drop something very small"*

The final piece of evidence relied upon by the district court was Officer Holland's apparent observation that "one of the individuals drop[ped] something very small."  The police report states: "The males saw us and one turned and appeared to drop something very small."  The body-camera video does not show any suspect dropping something or record an officer's reference to seeing that before initiating the stop.  Certainly, the district court could credit assertions of an officer about what happened that a camera would have missed.  After making the arrest, the video shows Officer Holland searching the ground where the group was standing.  He later found a plastic bag and stated that one of the individuals must have consumed its contents.

Attempts to hide or discard contraband can contribute to suspicion or probable cause.  *See, e.g.*, *United States v. Wadley*, 59 F.3d 510, 513 (5th Cir. 1995) ("[A] reasonable officer was entitled to conclude that [the suspect] was attempting to evade capture so that he could discard the drugs he was carrying."); *United States v. Watson*, 953 F.2d 895, 897 (5th Cir. 1992)

(finding suspicious that the suspect "move[d] about in his seat as if to conceal or retrieve some item").

The record before us is thin on this apparent observation.  The first reference is in the police report, stating that one individual "appeared to drop something very small."  Perhaps this action, one that the subsequent search suggests may have just been littering, could be evidence supporting reasonable suspicion of a more substantial crime.  Being able to evaluate the credibility of the officer making that statement would be useful.

## VI.    *Evidentiary hearing*

No hearing was held on the suppression motion, but apparently none was requested.  Such a hearing could have allowed officers to explain further what they observed or knew.  Because there was no testimony, no credibility determinations were made by the district court.

On the record before us, we conclude that the Government failed to show that the officers had reasonable suspicion that McKinney was engaged in criminal activity.  If anything, the record supports that officers stopped McKinney solely because he was with a group near the location of recent shootings and was wearing something red. Perhaps the jacket he was wearing was suspicious, and perhaps the officers did see the suspicious discarding of something as they approached, but the record before us does not support a reasonable suspicion based on those grounds.  Therefore, the Government failed to meet its burden of showing that the initial detention was justified at its inception.  *See Monsivais*, 848 F.3d at 357.

Because we remand for further proceedings, we will discuss the legality of the frisk as well.  Even if the officers had reasonable suspicion to initiate the stop, the pat-down needs its own justification.  The Supreme Court has explained that in *Terry v. Ohio*, "the Court considered whether an investigatory stop (temporary detention) and frisk (patdown for weapons)

may be conducted without violating the Fourth Amendment's ban on unreasonable searches and seizures." *Arizona v. Johnson*, 555 U.S. 323, 326 (2009). Certainly, the investigatory stop itself must be lawful. *Id.* We have discussed the uncertainties in the record on that issue and have remanded. Next, even if an officer is justified in making a brief investigatory stop, "to proceed from a stop to a frisk, the police officer must reasonably suspect that the person stopped is armed and dangerous." *Id.* at 326–27. We have described the standard for justifying a pat-down as being "more onerous" than that for the initial stop. *Monsivais*, 848 F.3d at 357 n.1.

The district court concluded that the officers had reasonable suspicion that McKinney was armed and dangerous, based on the facts that McKinney was wearing a jacket, backpack, and hat on that night, and that his clothes were red. That evidence was insufficient to provide reasonable suspicion for the stop and, consequently, could not support the more onerous requirements for a frisk. If additional evidence is introduced on remand that more fully explains what officers saw, that evidence can be considered as to the suspicions both for the initial stop and for the frisk.

The district court also held that reasonable suspicion to frisk was supported by McKinney's refusal to consent to a pat-down and by the discovery of the gun. These facts, though, are irrelevant. For one, a mere refusal to consent cannot support suspicion. *United States v. Machuca-Barrera*, 261 F.3d 425, 435 n.32 (5th Cir. 2001). For another, the ultimate discovery of the gun cannot support the frisk because "[t]he reasonableness of official suspicion must be measured by what the officers knew *before* they conducted their search." *J.L.*, 529 U.S. at 271 (emphasis added).

This appeal is from a conviction and sentence based on a conditional guilty plea. The condition was the validity of the denial of the suppression motion. The condition fails, and therefore so does the guilty plea. That does

not mean McKinney is acquitted, only that the judgment based on his guilty plea must be vacated.

On remand, the case can proceed as the district court directs. Should the Government seek to have the suppression motion reconsidered, an evidentiary hearing would be useful. A somewhat similar situation arose in a case in which the district court denied a motion to suppress evidence based on the good faith of an officer for stopping the defendant's vehicle for a traffic offense, and we reversed because the record did not contain evidence of a necessary fact for the existence of the offense. *United States v. Cole*, 444 F.3d 688, 690 (5th Cir. 2006) (deciding whether the traffic stop was properly made required evidence of whether there was a crosswalk). We vacated the denial of the motion to suppress evidence of drugs found in the defendant's vehicle after the traffic stop and remanded for additional fact findings as to whether the factual predicate for the offense existed. *Id.*; *see also United States v. Rogers*, 481 F. App'x 157, 159–60 (5th Cir. 2012) (finding the record to be inadequate to uphold a search and holding that it was error not to conduct an evidentiary hearing on the motion to suppress and therefore remanding).

Similarly, the record before us is insufficient to determine whether the officers had reasonable suspicion. The body-camera videos and police report do not sufficiently explain the events leading up to the initiation of the investigatory detention.

We VACATE the order of the district court denying McKinney's motion to suppress, VACATE his conviction and sentence, and REMAND the case to the district court for further proceedings. If the district court again denies McKinney's motion to suppress, it shall reinstate McKinney's conviction and sentence. *See United States v. Guzman*, 739 F.3d 241, 248–49 (5th Cir. 2014). If either McKinney or the Government seeks appellate review following remand, the appeal will be assigned to this panel.